ROBBINS LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsllp.com
CRAIG W. SMITH (164886)
csmith@robbinsllp.com
SHANE P. SANDERS (237146)
ssanders@robbinsllp.com
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| TIMOTHY HIMSTREET, Derivatively on Behalf of WELLS FARGO & COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> CHARLES W. SCHARF, CHARLES H. NOSKI, DONALD M. JAMES, SUZANNE M. VAUTRINOT, RONALD L. SARGENT, JUAN A. PUJADAS, CELESTE A. CLARK, THEODORE F. CRAVER, JR., MARIA R. MORRIS, WAYNE M. HEWETT, RICHARD B. PAYNE, JR., TIMOTHY J. SLOAN, JOHN R. SHREWSBERRY, and C. ALLEN PARKER, <br><br> Defendants, <br><br> -and- <br><br> WELLS FARGO & COMPANY, a Delaware Corporation, <br><br> Nominal Defendant. | Case No. <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Wells Fargo & Company ("Wells Fargo" or the "Company") against certain of its officers and directors for violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment. These wrongs resulted in billions of dollars in damages to Wells Fargo's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Wells Fargo to billions of dollars in potential liability for violations of state and federal law.

2. Wells Fargo is a financial services company that provides banking, investment, mortgage, and consumer and commercial finance products and services to individuals, businesses, and institutions worldwide. In recent years, Wells Fargo has been embroiled in numerous high-profile scandals due to the disclosure of its unlawful and pervasive sales practices that led to consumer abuses spanning nearly two decades. In 2016, for example, the public learned that the Company's employees opened millions of unauthorized accounts in its customers' names, resulting in unauthorized fees. In 2017, the public learned that Wells Fargo's employees had engaged in additional consumer abuses, including discriminating against minority borrowers, imposing improper mortgage fees, facilitating erroneous foreclosures, and enrolling customers in automobile insurance policies without their consent. Employees were pressured to engage in those actions due to an improper tone at the top that placed short term profits over all other aspects of the business.

3. In response to the Company's illegal practices, several federal and state agencies, including the Board of Governors of the Federal Reserve System (the "FRS"), the Consumer Financial Protection Bureau (the "CFPB"), and the Office of the Comptroller of the Currency (the "OCC"), entered into

regulatory consent orders with Wells Fargo.  The consent orders imposed severe restrictions on Wells Fargo's continued operations and growth, and required the Company and its Board of Directors (the "Board") to remediate the harm it caused to its customers and enact strict oversight measures over its risk and compliance programs.

4.     Specifically, on February 2, 2018, the FRS announced an enforcement action against Wells Fargo requiring the Company to address its oversight and governance failures.  As part of the enforcement action, Wells Fargo entered into a consent order with the FRS, under which Wells Fargo agreed to comply with the FRS's directives to ensure Board oversight and improve Wells Fargo's compliance and operational risk management policies and procedures.  Just two months later, on April 20, 2018, Wells Fargo entered into two coordinated consent orders with the CFPB and the OCC concerning additional consumer abuses related to unlawfully imposed mortgage fees and vehicle collateral protection insurance.  Under the CFPB and OCC consent orders, Wells Fargo agreed to pay $1 billion in fines.  Wells Fargo also agreed to develop and submit plans designed to strengthen its compliance and risk management and identify and remediate consumer harms.  Then, on May 4, 2018, Wells Fargo announced that it agreed to pay $480 million to settle a securities class action lawsuit arising from the Company's fake customer accounts scandal.  In November 2019, Wells Fargo and its insurance partner agreed to pay another $432 million to settle consumer claims arising from the Company's automobile insurance scandal.  On February 21, 2020, Wells Fargo agreed to pay $3 billion to settle criminal and civil investigations into the unauthorized accounts scandal.

5.     Yet, instead of overhauling its broken culture, Wells Fargo focused its efforts on restoring its public image.  Immediately after the unauthorized accounts scandal broke in 2016, and continuing after the regulatory consent orders, the Company engaged in a public relations campaign to repair its damaged reputation.  Specifically, the Individual Defendants (as defined herein) repeatedly touted that Wells Fargo had implemented and would continue to implement meaningful corporate reforms.  The Individual Defendants further maintained that their reform efforts were in compliance with the regulatory consent orders.

6.     Unbeknownst to investors and the general public, however, the Individual Defendants' representations about the Company's reform efforts, including making any meaningful improvements to

its risk and compliance programs, were misleading.  In truth—even after the highly publicized scandals, heightened regulatory scrutiny, class action lawsuits, and billions of dollars in regulatory fines— the Company's failure of oversight over its risk and compliance programs continued, and its submitted remediation plans to regulators were woefully deficient.

7.     In the midst of this wrongdoing, certain of the Director Defendants (as defined herein) negligently made false and misleading statements in the Company's 2018 Proxy Statement on Form DEF14A (the "2018 Proxy") filed with the SEC on March 14, 2018.  The 2018 Proxy was filed ahead of the Company's Annual Meeting of Shareholders.  The 2018 Proxy included a proposal to reelect certain of the Director Defendants to the Board.  In connection with these defendants' efforts to reelect themselves to the Board, they asserted that they were engaged in risk and compliance oversight, and that the Board's Audit Committee exercised oversight of the Company's financial statements.  In addition, the 2018 Proxy included two stockholder proposals: (i) demanding the Company engage multiple outside independent experts or resources from the general public to reform its executive compensation policy with social responsibility; and (ii) demanding that the Board prepare a report, to be issued to stockholders, on the Company's employee incentive compensation and the risk of material losses.  The defendant directors asserted that these measures were unnecessary and not in the best interest of stockholders.  In connection with their efforts to persuade stockholders to vote against the two stockholder proposals, these members of the Board issued false and misleading statements concerning the Company's remedial and compliance efforts.

8.     The truth behind the Company's abject failures to comply with regulators began to emerge on March 4, 2020, when the U.S. House Committee on Financial Services (the "Financial Services Committee") released a 113-page report titled "The Real Wells Fargo: Board & Management Failures, Consumer Abuses, and Ineffective Regulatory Oversight" (the "Report").  The Report detailed the results of the Financial Services Committee's year-long investigation into Wells Fargo's noncompliance with five regulatory consent orders, including the FRS, CFPB, and OCC Consent Orders.  According to the Report, Wells Fargo had repeatedly failed to satisfy the terms of the Consent Orders and establish the safeguards necessary to protect consumers from harm.  As the Report stated, Wells Fargo's remediation plans submitted to regulators were "riddled with errors and discrepancies, such as incorrect progress indicators

for deliverables and 'illogical timeframes' for achieving future milestones."  The Report concluded that the Company's risk management infrastructure remains broken.  Further, the Company's "[B]oard and management repeatedly have failed to demonstrate that the Bank can establish a compliance management infrastructure capable of preventing consumer abuses."

9.     Accordingly, the Report concluded, the "time has come for Congress to compel regulators to be more aggressive with regard to megabanks like Wells Fargo in using the supervisory tools and sanctions available to them."  Moreover, the Financial Services Committee recommended that Congress "consider legislation mandating that regulators immediately direct a recidivist megabank like Wells Fargo to remove complacent and ineffective directors ... and compel regulators to either (a) downsize Wells Fargo…, or (b) wind down the bank[.]"

10.     On this news, Wells Fargo's market capitalization plunged 21.5%, or $8.92 per share, on March 9, 2020, to close at $32.48 per share compared to the closing of $41.40 per share on March 4, 2020, erasing more than $36.5 billion in market capitalization in just three trading days.

11.     On March 10, 2020, Wells Fargo's Chief Executive Officer ("CEO") and President, defendant Charles W. Scharf ("Scharf"), testified before the Financial Services Committee.  In his opening remarks, defendant Scharf admitted that Wells Fargo has "not yet done what is necessary to address [its] shortcomings," noting that the Company's "culture was broken."  Following defendant Scharf's testimony, Chairwoman Maxine Waters, via a letter to Attorney General William Barr, requested that the U.S. Department of Justice ("DOJ") review Wells Fargo's prior testimony during a Financial Services Committee hearing held the previous year for potential violation of the federal law prohibiting knowingly and willfully making a false statement to Congress.

12.     On this news, Wells Fargo's market capitalization fell $2.75 per share, on March 11, 2020, to close at $32.33 per share compared to the previous trading day's closing of $35.08 per share, erasing another $11 billion in market capitalization in a single trading day.

13.     In addition to the significant market capitalization loss, and as a direct result of this unlawful course of conduct, Wells Fargo is now the subject of numerous federal securities class action lawsuits filed in the U.S. District Court for the Northern District of California and the U.S. District Court for the Southern District of New York on behalf of investors who purchased Wells Fargo shares.

14.     Unfortunately, the Company's abusive practices have continued, despite the numerous scandals, public scrutiny, investor lawsuits, and government investigations.  In the middle of the above wrongdoing, Wells Fargo once again engaged in a scheme designed to generate profits at the expense of its own customers.

15.     In early 2020, the World Health Organization declared a worldwide pandemic due to the COVID-19 outbreak.  Seeking to aid struggling Americans, the U.S. Senate passed the Coronavirus Aid Relief and Economic Security Act, also known as the CARES Act.  As part of the CARES Act, Congress appropriated $349 billion in funds to the U.S. Small Business Administration ("SBA") to fund a small business loan program, called the Paycheck Protection Program ("PPP").  The PPP intended to provide small businesses with eight weeks of assistance through federally guaranteed loans.  The loans would be administered by private banks, such as Wells Fargo, through their existing lending programs.  Small businesses seeking PPP loans would submit their applications through these banks.  The SBA mandated that the funds be distributed on a "first-come, first-served" basis.

16.     The PPP offered lenders, such as Wells Fargo, large commissions of 1% to 5% of the loan amount.  The Company was therefore incentivized to favor bigger customers, particularly those with pre-existing lending relationships with Wells Fargo, in order to maximize commissions for the least amount of work.

17.     As soon as the PPP loans began to be dispersed on April 3, 2020, Wells Fargo urged small businesses to apply, publicly stating that it would focus its attention on small businesses and nonprofits and that it would conform its conduct to the "terms of the program," including processing applications on a first-come, first-served basis.  The Company repeatedly communicated to the public that it intended to follow the terms of the program and direct PPP funds to the small businesses that Congress intended to help.  Wells Fargo received thousands of applications.

18.     Unbeknownst to these small business applicants, however, Wells Fargo chose to prioritize higher loans for bigger companies, despite the SBA requirement that loans be processed on a first-come, first-served basis.  As a result, thousands of loan applicants seeking much needed assistance received nothing while Wells Fargo received more profits.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

19.     On April 19, 2020, several small business owners filed a federal class action lawsuit against Wells Fargo alleging that the Company unfairly allocated PPP loans to generate larger loan origination fees.  While thousands of small businesses trusted that Wells Fargo would process the applications on a first-come, first-served basis, the Company instead reshuffled PPP applications to prioritize higher loans for bigger companies.  Further, "[m]aking matters worse, Wells Fargo concealed from the public that it was reshuffling the PPP applications it received and prioritizing the applications that would make the bank the most money."  *USA Today* reported on the lawsuit that same day in an article titled, "Lawsuit Alleges Wells Fargo Unfairly Shuffled Paycheck Protection Program Applications."

20.     On this news, Wells Fargo's market capitalization fell $1.85 per share, on April 23, 2020, to close at $26.53 per share compared to the closing of $28.38 per share on April 17, 2020, erasing another $7.5 billion in market capitalization in just four trading days.

21.     On May 5, 2020, Wells Fargo revealed that the Company had been named in putative class actions "in state and federal court in Texas, California, and Colorado."  In addition, Wells Fargo had received formal and informal inquiries from federal and state governmental agencies regarding its offering of PPP loans.

22.     On this news, Wells Fargo's market capitalization fell $2.12 per share, on May 7, 2020, to close at $25.23 per share compared to the closing of $27.35 per share on May 4, 2020, erasing another $8.6 billion in market capitalization in just three days.

23.     The Company's pervasive and abusive culture of wrongdoing has only continued, unfortunately, as more information about the Individual Defendants' repeated attempts to mislead the public continues to be revealed.  The Individual Defendants are again responsible for a series of improper statements, this time concerning the credit quality of Wells Fargo's commercial credit portfolios and the Company's underwriting and due diligence practices.  Specifically, between October 13, 2017 and October 14, 2020, the Individual Defendants made false and misleading statements claiming that Wells Fargo's commercial credit portfolios were of exceptional credit quality and that the Company deployed industry-leading underwriting and due diligence policies and procedures when processing these loans.  In truth, however, Wells Fargo fueled its growth by lending to businesses that posed a heightened risk of default.  Then, the Company systematically concealed these credit risks by artificially inflating the incomes

generated by borrowing businesses, failing to follow proper underwriting procedures, and evading applicable risk controls.  As a result, the Individual Defendants' representations of the quality of Wells Fargo's commercial credit portfolios, as well as its artificially inflated financial statements, were misleading.

24.     The truth about the Company's deficient commercial lending practices was slowly revealed between April 14, 2020 and October 14, 2020, during which Wells Fargo was forced to announce disappointing first, second, and third quarter financial results.  For each quarter, the Company revealed it was taking on billions of dollars of provision expenses (accounting for bad debt) to account for expected credit delinquencies in its commercial credit portfolios.  The significant and sustained stress has deteriorated Wells Fargo's commercial credit portfolio, and as a result, the Company has suffered substantial losses.

25.     As a direct result of this unlawful course of conduct, Wells Fargo is now the subject of yet another federal securities class action lawsuit filed in the U.S. District Court for the Northern District of California on behalf of investors who purchased Wells Fargo shares.

## **JURISDICTION AND VENUE**

26.     This Court has jurisdiction under 28 U.S.C. §1331 because the claims asserted herein arise under section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  This Court has exclusive subject matter jurisdiction over the federal securities law claims under section 27 of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.

27.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

28.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Wells Fargo maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein,

1   and aiding and abetting and conspiracy in violation of fiduciary duties owed to Wells Fargo, occurred in

2   this District; and (iv) defendants have received substantial compensation in this District by doing business

3   here and engaging in numerous activities that had an effect in this District.

## INTRADISTRICT ASSIGNMENT

5       29.    A substantial portion of the transactions and wrongdoings which give rise to the claims in

6   this action occurred in the County of San Francisco.  Related securities class actions are pending in the

7   San Francisco division of this Court and therefore, this action is properly assigned to the San Francisco

8   division.

## THE PARTIES

**Plaintiff**

11       30.    Plaintiff Timothy Himstreet has continuously been a stockholder of Wells Fargo since

12   August 2014.

**Nominal Defendant**

14       31.    Nominal defendant Wells Fargo is a Delaware corporation with principal executive offices

15   located at 420 Montgomery Street, San Francisco, California.  Wells Fargo serves as a holding company

16   for its subsidiaries that primarily operate as financial services companies and provide banking, investment

17   and mortgage products and services, and consumer and commercial finance services.  As of December

18   31, 2019, Wells Fargo had 259,800 employees.

**Defendants**

20       32.    Defendant Scharf is Wells Fargo's CEO, President, and director and has been since October

21   2019.  Defendant Scharf is named as a defendant in related securities class action complaints that allege

22   he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

23   Defendant Scharf knowingly, recklessly, or with gross negligence allowed the Company to operate with

24   inadequate risk and compliance management, policies, and programs.  Defendant Scharf also knowingly,

25   recklessly, or with gross negligence made improper statements in the Company's press releases and public

26   filings concerning the Company's abject failure to comply with regulatory consent orders, as well as its

27   deficient commercial lending practices.  Wells Fargo paid defendant Scharf the following compensation

28   as an executive:

| Year | Salary | Bonus | Stock Awards | Total |
|---|---|---|---|---|
| 2019 | $498,084 | $5,000,000 | $28,788,490 | $34,286,574 |

33.   Defendant Charles H. Noski ("Noski") is Wells Fargo's Chairman of the Board and has been since March 2020 and a director and has been since June 2019.  Defendant Noski is Chair of the Company's Audit Committee and has been since at least March 2020.  Defendant Noski knowingly, in bad faith, or in conscious disregard for his duties allowed the Company to operate with inadequate risk and compliance management, policies, and programs.  Defendant Noski also knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Wells Fargo to make improper statements and omissions in the Company's press releases and public filings concerning the Company's abject failure to comply with regulatory consent orders, as well as its deficient commercial lending practices.  Wells Fargo paid defendant Noski the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $67,750 | $165,036 | $232,786 |

34.   Defendant Donald M. James ("James") is a Wells Fargo director and has been since January 2009.  Defendant James knowingly, recklessly, or with gross negligence allowed the Company to operate with inadequate risk and compliance management, policies, and programs.  Defendant James knowingly, in bad faith, or in conscious disregard for his duties allowed the Company to operate with inadequate risk and compliance management, policies, and programs.  Defendant James also knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Wells Fargo to make improper statements and omissions in the Company's press releases and public filings concerning the Company's abject failure to comply with regulatory consent orders, as well as its deficient commercial lending practices.  Wells Fargo paid defendant James the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $196,000 | $180,025 | $376,025 |
| 2018 | $178,000 | $180,004 | $358,004 |

35.   Defendant Suzanne M. Vautrinot ("Vautrinot") is a Wells Fargo director and has been since February 2015.  Defendant Vautrinot is a member of the Company's Corporate Responsibility Committee

and has been since at least March 2018.  Defendant Vautrinot was a member of the Company's Audit Committee in at least March 2017.  Defendant Vautrinot knowingly, in bad faith, or in conscious disregard for her duties allowed the Company to operate with inadequate risk and compliance management, policies, and programs.  Defendant Vautrinot also knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Wells Fargo to make improper statements and omissions in the Company's press releases and public filings concerning the Company's abject failure to comply with regulatory consent orders, as well as its deficient commercial lending practices.  Wells Fargo paid defendant Vautrinot the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $169,167 | $180,025 | $349,192 |
| 2018 | $168,153 | $180,004 | $348,157 |

36.     Defendant Ronald L. Sargent ("Sargent") is a Wells Fargo director and has been since February 2017.  Defendant Sargent is a member of the Company's Audit Committee and has been since at least March 2018.  Defendant Sargent was a member of the Company's Corporate Responsibility Committee in at least March 2019.  Defendant Sargent knowingly, in bad faith, or in conscious disregard for his duties allowed the Company to operate with inadequate risk and compliance management, policies, and programs.  Defendant Sargent also knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Wells Fargo to make improper statements and omissions in the Company's press releases and public filings concerning the Company's abject failure to comply with regulatory consent orders, as well as its deficient commercial lending practices.  Wells Fargo paid defendant Sargent the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $214,000 | $180,025 | - | $394,025 |
| 2018 | $174,153 | $180,004 | $5,000 | $359,157 |

37.     Defendant Juan A. Pujadas ("Pujadas") is a Wells Fargo director and has been since September 2017.  Defendant Pujadas knowingly, in bad faith, or in conscious disregard for his duties allowed the Company to operate with inadequate risk and compliance management, policies, and programs.  Defendant Pujadas also knowingly, in bad faith, or in conscious disregard for his duties caused

or allowed Wells Fargo to make improper statements and omissions in the Company's press releases and public filings concerning the Company's abject failure to comply with regulatory consent orders, as well as its deficient commercial lending practices. Wells Fargo paid defendant Pujadas the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $201,065 | $180,025 | $381,090 |
| 2018 | $157,000 | $180,004 | $337,004 |

38.   Defendant Celeste A. Clark ("Clark") is a Wells Fargo director and has been since January 2018. Defendant Clark is the Chair of the Company's Corporate Responsibility Committee and has been since at least March 2019, and a member of that committee and has been since at least March 2018. Defendant Clark knowingly, in bad faith, or in conscious disregard for her duties allowed the Company to operate with inadequate risk and compliance management, policies, and programs. Defendant Clark also knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Wells Fargo to make improper statements and omissions in the Company's press releases and public filings concerning the Company's abject failure to comply with the regulatory consent orders, as well as its deficient commercial lending practices. Wells Fargo paid defendant Clark the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $157,833 | $180,025 | $337,858 |
| 2018 | $123,000 | $240,056 | $363,056 |

39.   Defendant Theodore F. Craver, Jr. ("Craver") is a Wells Fargo director and has been since January 2018. Defendant Craver is a member of the Company's Audit Committee and has been since at least March 2018. Defendant Craver knowingly, in bad faith, or in conscious disregard for his duties allowed the Company to operate with inadequate risk and compliance management, policies, and programs. Defendant Craver also knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Wells Fargo to make improper statements and omissions in the Company's press releases and public filings concerning the Company's abject failure to comply with regulatory consent orders, as well as its deficient commercial lending practices. Wells Fargo paid defendant Craver the following

compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $180,000 | $180,025 | $360,025 |
| 2018 | $163,542 | $240,056 | $403,598 |

40.     Defendant Maria R. Morris ("Morris") is a Wells Fargo director and has been since January 2018.  Defendant Morris knowingly, in bad faith, or in conscious disregard for her duties allowed the Company to operate with inadequate risk and compliance management, policies, and programs. Defendant Morris also knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Wells Fargo to make improper statements and omissions in the Company's press releases and public filings concerning the Company's abject failure to comply with regulatory consent orders, as well as its deficient commercial lending practices.  Wells Fargo paid defendant Morris the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $273,333 | $180,025 | $453,358 |
| 2018 | $172,556 | $240,056 | $412,612 |

41.     Defendant Wayne M. Hewett ("Hewett") is a Wells Fargo director and has been since January 2019.  Defendant Hewett is a member of the Company's Corporate Responsibility Committee and has been since at least March 2019.  Defendant Hewett knowingly, in bad faith, or in conscious disregard for his duties allowed the Company to operate with inadequate risk and compliance management, policies, and programs.  Defendant Hewett also knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Wells Fargo to make improper statements and omissions in the Company's press releases and public filings concerning the Company's abject failure to comply with the regulatory consent orders, as well as its deficient commercial lending practices.  Wells Fargo paid defendant Hewett the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $183,790 | $240,051 | $423,841 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

42.     Defendant Richard B. Payne, Jr. ("Payne") is a Wells Fargo director and has been since October 2019.  Defendant Payne knowingly, in bad faith, or in conscious disregard for his duties allowed the Company to operate with inadequate risk and compliance management, policies, and programs. Defendant Payne also knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Wells Fargo to make improper statements and omissions in the Company's press releases and public filings concerning the Company's abject failure to comply with the regulatory consent orders, as well as its deficient commercial lending practices.  Wells Fargo paid defendant Payne the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $23,847 | $105,024 | $128,871 |

43.     Defendant Timothy J. Sloan ("Sloan") was Wells Fargo's CEO and a director from October 2016 to March 2019 and President from November 2015 to March 2019.  Defendant Sloan was also Wells Fargo's Chief Operating Officer from November 2015 to October 2016, Senior Executive Vice President, Wholesale Banking from May 2014 to November 2015, Senior Executive Vice President and Chief Financial Officer from February 2011 to May 2014, and Senior Executive Vice President and Chief Administrative Officer from September 2010 to February 2011.  Defendant Sloan is named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  Defendant Sloan knowingly, recklessly, or with gross negligence allowed the Company to operate with inadequate risk and compliance management, policies, and programs.  Defendant Sloan also knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's abject failure to comply with the regulatory consent orders, as well as its deficient commercial lending practices. Wells Fargo paid defendant Sloan the following compensation as an executive:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------------------------------------------------------|------------------------|-------|
| 2019 | $1,567,816 | $33 | - | $107,932 | $21,905 | $1,697,686 |
| 2018 | $2,400,000 | $14,000,056 | $2,000,000 | $7,428 | $19,250 | $18,426,734 |

44.     Defendant John R. Shrewsberry ("Shrewsberry") was Wells Fargo's Senior Executive Vice President and Chief Financial Officer from May 2014 to October 2020, and also served in various roles of increasing responsibility at the Company or its predecessors.  Defendant Shrewsberry is named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  Defendant Shrewsberry knowingly, recklessly, or with gross negligence allowed the Company to operate with inadequate risk and compliance management, policies, and programs.  Defendant Shrewsberry also knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's abject failure to comply with the regulatory consent orders, as well as its deficient commercial lending practices.  Wells Fargo paid defendant Shrewsberry the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------------------------------------------------------|------------------------|-------|
| 2019 | $2,000,000 | $9,250,072 | $1,147,500 | $22,176 | $16,800 | $12,436,548 |
| 2018 | $2,000,000 | $9,250,013 | $1,250,000 | $9,595 | $19,250 | $12,528,858 |

45.     Defendant C. Allen Parker ("Parker") was Well Fargo's Interim CEO and President from March 2019 to September 2019; Senior Executive Vice President and General Counsel from March 2017 to March 2019 and from September 2019 to March 2020.  Defendant Parker is named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  Defendant Parker knowingly, recklessly, or with gross negligence allowed the Company to operate with inadequate risk and compliance management, policies, and programs.  Defendant Parker also knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's abject failure to

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

comply with the regulatory consent orders, as well as its deficient commercial lending practices. Wells Fargo paid defendant Parker the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2019 | $1,781,609 | $1,500,000 | $5,004,996 | $1,287,637 | $26,050 | $9,600,292 |

46.     The defendants identified in ¶¶32, 43-45 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶32-43 are referred to herein as the "Director Defendants." The defendants identified in ¶¶33, 36, 39 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶32-45 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

47.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Wells Fargo and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Wells Fargo in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Wells Fargo and not in furtherance of their personal interest or benefit.

48.     To discharge their duties, the officers and directors of Wells Fargo were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Wells Fargo were required to, among other things:

(a)     ensure that the Company operated in a diligent, honest, and prudent manner in compliance with all laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements and refrained from engaging in deceptive conduct;

(c)     ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management;

(d)     properly and accurately guide stockholders and analysts as to the true business practices, operations, financials, financial prospects, compliance policies, and internal controls of the

Company at any given time, including making accurate statements about the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls;

(e)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(f)     remain informed as to how Wells Fargo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Additional Duties Under Wells Fargo's Corporate Governance Guidelines and Code of Ethics and Business Conduct**

49.     Wells Fargo allegedly holds its fiduciaries to specific corporate principles.  In particular, in the Company's Corporate Governance Guidelines, Wells Fargo describes the duties undertaken by the Board and the active oversight role the Board plays in the Company's business affairs.  In particular, the Corporate Governance Guidelines state that the Board is responsible for:

ii. reviewing, monitoring and, where appropriate, approving the Company's strategic plans and objectives, financial performance, risk management framework and risk appetite; and

iii. ensuring processes are in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance and risk management.

50.     The Individual Defendants, as officers and directors of Wells Fargo, were also bound by the Company's Code of Ethics and Business Conduct (the "Code").  The Code sets out basic principles to guide all directors, officers, and employees of Wells Fargo who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.  In particular, the Code provides:

We are committed to following all applicable laws, rules and regulations that apply to our businesses.

*       *       *

> We are committed to full, fair, accurate, timely, and understandable disclosure in the public reports and documents that Wells Fargo files with, submits, or provides to the U.S. Securities and Exchange Commission, other regulatory authorities, our shareholders, and the public.

**Government Mandated Duties Pursuant to the Regulatory Consent Orders**

51.     On February 2, 2018, the FRS executed a Consent Order, pursuant to which the Board agreed to submit a written plan within sixty days to enhance its effectiveness in carrying out its oversight duties.  At minimum, the Board's plan was required to address, consider, and include: (i) actions it will take to improve its effectiveness; (ii) actions to improve its oversight of senior management; (iii) actions to ensure management's effectiveness in managing risk; (iv) actions to ensure the establishment of an independent firmwide risk management function; (v) actions to ensure that compensation and incentives are consistent with risk management objectives; and (vi) comprehensive reporting that the Board will use to ensure compliance with the FRS Consent Order.  In particular, the FRS Consent Order stated:

> **Board Effectiveness**
>
> 2. Within 60 days of this Order, the Board shall submit a written plan to further enhance the Board's effectiveness in carrying out its oversight and governance of WFC, acceptable to the Reserve Bank. The plan shall, at a minimum, address, consider, and include:
>
> (a) actions that the Board will take to further improve its effectiveness, including:
>
>> (i) actions to ensure that the Firm's strategy and risk tolerance are clear and aligned and within the Firm's risk management capacity;
>>
>> (ii) actions to ensure its composition, governance structure, and practices support its strategy and are aligned with its risk tolerance; and
>>
>> (iii) a plan to ensure that no roles or responsibilities of the Board are unfulfilled for an undue period of time following the departure of any member of the Board;
>
> (b) actions that the Board will take to further improve its oversight of senior management, including holding senior management accountable for implementing and maintaining the Firm's strategy in accordance with Board direction and the Firm's risk tolerance and capacity, and the Firm's risk management and control framework (including the enhancements required in this Order);
>
> (c) actions the Board will take to ensure senior management's ongoing effectiveness in managing the Firm's activities and related risks and promoting strong risk management across the Firm;

(d) actions that the Board will take to ensure senior management establishes, and thereafter maintains:

(i) an effective and independent firmwide risk management function that:

(A) covers all material risks facing the Firm;

(B) has the requisite stature, authority, and resources, with clearly defined roles and responsibilities (as determined pursuant to the review required in paragraph (c)), and provides for staffing WFC's risk management function with the appropriate level of expertise, including with respect to WFC's operational and compliance risk management functions; and

(C) with respect to compliance and operational risk management, maintains a management structure that promotes effective oversight and control of compliance and operational risks, that is appropriately independent of the related line of business, and that has separate and independent reporting lines to the Chief Risk Officer and to the Board or an appropriate committee of the Board;

(ii) an effective risk tolerance program that defines the Firm's risk capacity and the tolerances under which it will operate;

(iii) an effective risk identification and escalation framework that identifies, aggregates, evaluates and appropriately reports material risk issues, plans to address risks, and progress with respect to those plans;

(iv) a comprehensive and effective risk data governance and management framework;

(e) actions that the Board will take with respect to any additional enhancements to WFC's performance management processes that are necessary to ensure that compensation and other incentives are consistent with risk management objectives and measurement standards, including, but not limited to, appropriate consequences for violations of WFC's policies, applicable laws and regulations, and adverse risk outcomes; and

(f) comprehensive reporting that will enable the Board to oversee management's execution of its risk management responsibilities, including, but not limited to, measures taken to comply with this Order, and provide the Board with sufficient information to evaluate the effectiveness of the operational and compliance risk management functions.

52.     Each Board member at the time signed the FRS Consent Order, including defendants Sloan, Clark, Craver, James, Morris, Pujadas, Sargent, Vautrinot, and nondefendants Elizabeth A. Duke, John D. Baker II, John S. Chen, Lloyd H. Dean, Enrique Hernandez, Jr., Karen B. Peetz, Federico F. Pena, and James H. Quigley.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

53.    The CFPB and OCC Consent Orders issued on April 20, 2018, each imposed additional duties on the Board to ensure the Company's compliance with the law.  The CFPB Consent Order required that the Board review all submissions, "including plans, reports, programs, policies, and procedures," before Wells Fargo submitted its remediation plans to the CFPB.  The CFPB Consent Order stated that "[t]he Board will have the ultimate responsibility for proper and sound management of [Wells Fargo] and for ensuring that [Wells Fargo] complies with Federal Consumer Financial Law and this Consent Order, including successful execution of the Plans."  The OCC Consent Order required the Board to appoint and maintain an active Compliance Committee "responsible for monitoring and overseeing the Bank's compliance with the provisions of this Order."  Moreover, within 120 days of the effective date of the Consent Order and every forty-five days after the end of each quarter thereafter, the Board shall review and forward a copy of the Compliance Committee's written progress report to the OCC.  Further, "[t]he Board shall ensure that the [Company] achieves and thereafter maintains compliance with this Order, including, without limitation, successful execution of the Plans ... and "ensure that the [Company] implements and adheres to the Company's [revised Compliance Risk Management Program]."  Finally, the OCC mandated that "[t]he Board shall ensure that the [Company] has processes, personnel, and control systems to ensure implementation of and adherence to the plans, programs, policies, and procedures required by this Order."

**Additional Duties of the Audit Committee Defendants**

54.    In addition to these duties, under the Audit Committee Charter, the Audit Committee Defendants, defendants Baker, Craver, and Sargent, owed specific duties to Wells Fargo to assist the Board in overseeing the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the Company's internal controls over financial reporting, among other things.  In particular, the Audit Committee Charter states:

> The purpose of the Audit and Examination Committee is to assist the Board of Directors in fulfilling its responsibilities to oversee:
>
> • the integrity of the Company's financial statements and the adequacy and reliability of disclosures to stockholders and bank regulatory agencies, including management activities related to accounting and financial reporting and internal controls;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

• the qualifications and independence of the Company's independent registered public accounting firm (the "independent auditor") and the activities and performance of the independent auditor and the internal audit function;

• the Company's compliance with legal and regulatory requirements; and

• reputation risk related to the Committee's responsibilities described in this Charter.

55.     The Audit Committee also had duties of oversight of risk management and legal compliance.  In particular, the Audit Committee Charter provides:

11. *Oversight of Compliance with Legal and Regulatory Requirements*.

• Review and discuss with management the functional framework and oversight policy established by management relating to compliance risk. The functional framework outlines the structure, policies, procedures, systems, controls, processes, and roles and responsibilities for managing compliance risk.

• Periodically receive updates and reports from management, including the Chief Compliance Officer, Chief Risk Officer, General Counsel and Chief Auditor, regarding compliance and legal matters that may have a significant impact on the Company's compliance risk functional framework and oversight policy or financial statements.

• Taking into consideration the Risk Committee's oversight of the Company's enterprise-wide risk management framework, primary oversight responsibility for operational risk, compliance risk, liquidity and funding risks, financial crimes risk (including Bank Secrecy Act ("BSA")/anti-money laundering risk), information security risk (including cyber), and technology risk, and the allocation of responsibility for risk oversight to the other committees of the Board, the Committee shall discuss at least annually the Company's guidelines and policies for assessing and managing risk, including reputation risk, the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

12. *Regulatory Oversight*. Discuss regulatory examination reports and letters addressed to the Committee or the Board, and receive at least quarterly summaries of significant examination reports and other significant communications from regulators, including areas of criticism or less-than-satisfactory ratings, and a corrective action program and timetable. The Committee shall meet with regulators, as a Committee or individually on behalf of the Committee, when requested by regulators or deemed necessary or appropriate by the Committee.

13. *Legal*. Review, at least quarterly, with the Company's General Counsel legal matters and emerging legal trends that may have a material impact on the financial statements and

any material correspondence, reports or inquiries received regarding investigations by regulators or governmental agencies.

**Breaches of Duties**

56.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Wells Fargo, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

57.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make improper statements to the public. The Individual Defendants further failed to implement adequate internal controls to ensure the Company's compliance with federal laws.  These improper practices wasted the Company's assets and caused Wells Fargo to incur substantial damage.

58.     The Individual Defendants, because of their positions of control and authority as officers or directors of Wells Fargo, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.   The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.

59.     As a result, and in addition to the damage the Company has already incurred, Wells Fargo has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Wells Fargo, regarding the Individual Defendants' management of Wells Fargo's operations and compliance with the law; and (ii) enhance the Individual Defendants' executive and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

directorial positions at Wells Fargo and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

62.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

63.    The Individual Defendants accomplished their conspiracy, common enterprise, or common course of conduct by causing the Company to purposefully or recklessly engage in repeated violations of law and release improper statements to the public.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

65.    Wells Fargo offers consumer financial products and services, including savings and checking accounts, credit cards, debit and ATM cards, and online-banking services.  In recent years, the Company has sought to distinguish itself in the marketplace as a leader in "cross-selling" these products and services to existing customers who did not already have them.  The Company, through compensation incentive programs, encouraged its employees to sign up existing clients for new products such as deposit accounts, credit cards, debit cards, and online banking.

66.    The Individual Defendants, however, failed to monitor the implementation of these programs with adequate care.  For nearly two decades, Wells Fargo engaged in the widespread illegal practice of secretly opening unauthorized customer accounts on behalf of and at the expense of the Company's own customers.  According to the CFPB, Wells Fargo's employees covertly opened accounts

and funded them by transferring funds from customer accounts without their knowledge or consent, often racking up fees or other charges. These employees were spurred by management-directed sales targets and compensation incentives. According to Wells Fargo's own analysis, its employees opened more than two million unauthorized deposit and credit card accounts. These consumer abuses developed and spread because of the Individual Defendants' complete failure of oversight over the Company's risk management protocols and internal controls over regulatory compliance. As a result, in 2016, these issues erupted in a series of public scandals, attracting regulatory scrutiny and civil lawsuits.

67.     On September 8, 2016, the CFPB, the OCC, and the Los Angeles City Attorney collectively assessed a $185 million civil penalty against Wells Fargo for its abusive sales practices. In addition, the CFPB and the OCC each entered into separate Consent Orders with the Company that required Wells Fargo to implement substantial reforms.

68.     According to the CFPB Consent Order, from January 1, 2011 to September 8, 2016, thousands of Wells Fargo employees engaged in improper sales practices related to the Company's aggressive incentive program which encouraged employees to "cross-sell" banking products to Wells Fargo customers. The CFPB Consent Order required Wells Fargo to submit a plan to remediate harmed customers. The CFPB Consent Order also required the Company to obtain an independent consultant to review its sales practices at its branch locations and to determine whether Wells Fargo's policies and procedures were adequate. The CFPB issued a $100 million fine against the Company for its abusive practices, the largest such penalty the agency had issued.

69.     Similarly, the OCC found that Wells Fargo's risk management and sales program oversight were severely deficient. The OCC Consent Order required the Company to develop and implement an enterprise-wide sales practices risk management and oversight program to "prevent and detect unsafe or unsound sales practices." The OCC Consent Order also required Wells Fargo to submit a plan to remediate harmed customers and ordered the Company to obtain an independent review of its sales practices.

70.     The next year, new details surfaced about Wells Fargo's fraudulent sales practices and pervasive consumer abuses. In March 2017, the OCC revealed that it had uncovered "an extensive and pervasive pattern and practice of discriminatory and illegal credit practices across multiple lines of business within the bank." These discriminatory practices included steering minority homebuyers into

more expensive mortgages than white borrowers.  The OCC also cited the Company's fake accounts scandal in 2016.  The OCC issued Wells Fargo a rare "needs to improve" rating based on a review of the Company's practices between 2009 and 2012.

71.     Then, in April 2017, Wells Fargo published a report detailing the findings of an independent investigation which revealed that members of Wells Fargo's Board and senior executives knew of many of the root causes of the fraudulent accounts scandal as far back as 2002.  In July 2017, Wells Fargo admitted that it charged as many as 570,000 customers for auto insurance they did not need.  In October 2017, Wells Fargo admitted that it improperly imposed fees on 110,000 mortgage borrowers whose delays in completing their loan applications were primarily the bank's fault.  As a result of these improper practices, and as described below, the CFPB and OCC fined the Company $1 billion.  In addition, Wells Fargo later settled claims for $432 million arising out of its illegal automobile insurance scheme.

**The FRS Restricts the Company's Growth Until It Improves Governance and Controls**

72.     Responding to the Company's widespread consumer abuses and other compliance breakdowns, on February 2, 2018, the Board of Governors of the FRS announced that it would restrict the Company's growth until it sufficiently improves its governance and controls.  Until Wells Fargo made sufficient improvements, it would be restricted from growing any larger than its total asset size as of the end of 2017.

73.     In addition to the growth restriction, the FRS Consent Order required the Company to improve its governance and risk management processes, including strengthening the effectiveness of oversight by its Board.  The FRS Consent Order required each current director to sign, including defendants Sloan, Clark, Craver, James, Morris, Pujadas, Sargent, and Vautrinot.

74.     The FRS Consent Order found that Wells Fargo pursued a business strategy that prioritized its overall growth without ensuring appropriate management of all key risks. The Company did not have an effective firm-wide risk management framework in place, which resulted in serious compliance breakdowns.  Emphasizing the need for improved director oversight of the firm, the FRS sent letters to each current Wells Fargo Board member confirming that they did not meet supervisory expectations.  As FRS Chair Janet L. Yellen stated, "[t]he enforcement action we are taking today will ensure that Wells

Fargo will not expand until it is able to do so safely and with the protections needed to manage all of its risks and protect its customers."

**THE INDIVIDUAL DEFENDANTS MAKE IMPROPER STATEMENTS REGARDING THE COMPANY'S COMPLIANCE WITH REGULATORY CONSENT ORDERS**

75.     The Individual Defendants are responsible for a series of improper statements regarding Wells Fargo's risk management oversight and its compliance with regulatory directives to remediate consumer harm and improve its company-wide deficiencies.  Between February 2, 2018 and March 10, 2020, the Individual Defendants made false or misleading statements and failed to disclose that Wells Fargo failed to comply with regulatory directives, including repeatedly submitting insufficiently developed and inadequate remediation plans, struggling to meet deadlines, and failing to implement meaningful reforms.  As a result, the Individual Defendants' representations of Wells Fargo's progress with its remediation plans were misleading, and regulators were moved to threaten supervisory or enforcement actions and additional penalties against the Company.

76.     On February 2, 2018, Wells Fargo issued a press release announcing that, as part of the FRS enforcement action, the Company entered into the FRS Consent Order.  Pursuant to the FRS Consent Order, the Company was required to submit its plans to "enhance the board's governance oversight, and the company's compliance and operational risk management" to the FRS within sixty days.  The press release also revealed that the FRS imposed a limit on the growth of Wells Fargo's total consolidated assets to its December 31, 2017 level until the FRS approved the required remediation plans.

77.     That next day, the Company held a conference call with analysts and investors to discuss the FRS Consent Order.  During the call, defendant Sloan maintained that Wells Fargo will "submit plans to the [FRS] that leverage existing plans and efforts already underway to further enhance the board's effectiveness in carrying out its oversight and governance of the company and further improve the firm-wide compliance and operational risk management program."  Defendant Sloan further stated that the Company had "centralized all risk management functions and are now implementing a fully integrated operating model for risk management across all businesses and staff groups."

78.     On March 14, 2018, Wells Fargo filed the 2018 Proxy.  In the 2018 Proxy, the Company provided an update on its reforms and remediation plans, stating that "the board and senior management

are committed to satisfying the requirements of the [FRS] consent order."  In addition, the Company

reiterated its commitment to reviewing its internal procedures.  In particular, the 2018 Proxy stated:

> As part of our transformation, Wells Fargo is committed to a thorough review of the
> products we offer and the internal procedures we use to get things done.  When we uncover
> anything that may be questionable, we address it and remediate any customers who may
> have been financially harmed.  To strengthen Wells Fargo's corporate culture, we are
> listening to our team members and inviting outside reviewers to help identify
> enhancements so we can make sure our culture is consistent across the organization.

79.    On April 13, 2018, Wells Fargo filed a Current Report on Form 8-K attaching its Quarterly

Supplement for the first quarter ended March 31, 2018, with the SEC.  The Quarterly Supplement provided

an update on the Company's compliance with the FRS Consent Order and reaffirmed its commitment to

satisfying the consent order's requirements.  In particular, the Quarterly Supplement stated, "[w]e take the

Consent Order seriously and will work to fully satisfy all of the Consent Order's requirements."

80.    That same day, the Company held an earnings conference call with analysts and investors

to discuss the FRS Consent Order.  Defendant Shrewsberry stated that Wells Fargo takes the FRS Consent

Order "seriously and we'll work to fully satisfy all of the consent order's requirements."  Defendant Sloan

added that the Company had "taken significant actions to strengthen" its management of operational and

compliance risk.  In particular, defendant Sloan stated:

> As part of our goal of setting the global standard in managing all forms of risk, over the
> past 19 months, ***we've taken significant actions to strengthen the way we manage
> operational and compliance risk at Wells Fargo***.  In March, we announced a new risk
> management organizational design, which is an important step to ensuring that risk
> management functions operate independently and provide improved and effective
> oversight of our businesses.

**The CFPB and OCC Fine the Company $1 Billion for Unsafe and Unsound Practices**

81.    On April 20, 2018, the Company issued a press release announcing that it had entered into

the Consent Orders with the CFPB and the OCC based on Wells Fargo's severe deficiencies and violations

of law, the financial harm to consumers, and the Company's failure to correct the deficiencies and

violations in a timely manner.

82.    Under the Consent Orders, the CFPB and the OCC assessed an aggregate of $1 billion in

civil penalties to resolve "matters pertaining to the company's compliance risk management program and

issues regarding certain interest rate-lock extensions on home mortgages and collateral protection

insurance (CPI) placed on certain auto loans."  Specifically, both the CFPB and OCC found that, as early as 2013, Wells Fargo employees improperly and inconsistently charged fees to thousands of mortgage-seeking customers to extend certain mortgage rates, including when Wells Fargo's own delay created the need for an extension.  In addition, between 2005 and 2016, the Company forced vehicle insurance policies on hundreds of thousands of customers.  Accordingly, the CFPB and OCC required Wells Fargo to make restitution to customers harmed by its unsafe and unsound practices, and develop and implement an effective enterprise-wide compliance risk management program.  Wells Fargo later settled consumer claims over its auto insurance scam for $432 million.

83.     On May 4, 2018, the Company filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2018 (the "Q1 2018 Form 10-Q") with the SEC.  The Q1 2018 Form 10-Q contained signed certifications by defendants Sloan and Shrewsberry pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that "[t]he information contained in the [Q1 2018 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."  The Q1 2018 Form 10-Q provided an update on Wells Fargo's purported compliance with the FRS Consent Order, including the submission of its remediation and improvement plans to the FRS.  In particular, the Q1 2018 Form 10-Q stated:

> On February 2, 2018, the Company entered into a consent order with the Board of Governors of the Federal Reserve System (FRB).  *As required by the consent order, the Board submitted to the FRB a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the FRB a plan to further improve the Company's compliance and operational risk management program.  As part of the review and approval process contemplated by the consent order, the Company will respond to any feedback provided by the FRB regarding the plans, including by making any necessary changes to the plans.*  The consent order also requires the Company, following the FRB's acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete by September 30, 2018, third-party reviews of the enhancements and improvements provided for in the plans.

84.     Also on May 4, 2018, Wells Fargo issued a press release announcing that it agreed to pay $480 million to settle a securities class action lawsuit arising from the Company's unauthorized customer accounts scandal.

85.     On May 7, 2018, the FRS rejected Wells Fargo's submission of its remediation plans via a formal Response Letter, stating that the Company's submission was rejected as "materially incomplete"

and that its remediation plans "cannot be evaluated by [the FRS] staff for their adequacy."  The FRS letter noted that the Company's plan "fail[s] to comprehensively address operational risk."  The FRS gave Wells Fargo until October 31, 2018, to revise its submission.

86.     On July 13, 2018, Wells Fargo issued a press release announcing its financial results for the second quarter of 2018.  In the press release, defendant Sloan stated, "[o]ur progress included making further improvements to our compliance and operational risk management programs."  During the earnings conference call held that same day, defendant Shrewsberry stated that the Company was "focused on satisfying the requirements of the Federal Reserve, OCC and CFPB consent orders."  Also during the call, defendant Sloan commented on the Company's investment in compliance and operational risk, emphasizing that Wells Fargo added "about 2,000 folks, team members in the risk function kind year-over-year."  Defendant Sloan further commented on the Company's compliance with the consent orders. In particular, defendant Sloan stated:

> [W]e're working very constructively with the Fed.  We've gotten some very thoughtful feedback from them.  And our expectation is that sometime in the first half of the next year, we'll be able to move through that.  I think the point to emphasize there is that our goal is not to just meet expectations so we can get the asset cap lifted.  Our goal is to make the fundamental investments and changes that we need to make in how we manage operational and compliance risk at the company.  That's the goal, and that's really where we're focused, but no update from a timing standpoint.

87.     On July 24, 2018, the OCC sent a formal Response Letter to Wells Fargo stating that the Company's submission of its remediation plan to the OCC "lacks substance and detail in a number of areas."  The OCC instructed the Company to submit a revised remediation plan and threatened "future supervisory and/or enforcement actions" if Wells Fargo failed to "achieve full compliance."

88.     Still, the Individual Defendants continued to mislead the public and misrepresent the Company's remediation efforts and compliance with the FRS, CFPB, and OCC Consent Orders.  On August 3, 2018, Wells Fargo filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2018 (the "Q2 2018 Form 10-Q") with the SEC.  The Q2 2018 Form 10-Q contained signed certifications by defendants Sloan and Shrewsberry pursuant to SOX that "[t]he information contained in the [Q2 2018 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."  The Q2 2018 Form 10-Q reiterated the Company's commitment to improve

its compliance and operational risk management programs.  With respect to the Company's compliance with the FRS Consent Order, the Q2 2018 Form 10-Q stated:

> As required by the consent order, the Board submitted to the FRB a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted, to the FRB a plan to further improve the Company's compliance and operational risk management program.  The consent order also requires the Company, following the FRB's acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete third-party reviews of the enhancements and improvements provided for in the plans.

89.     With respect to the Company's compliance with the CFPB and OCC Consent Orders, the Q2 2018 Form 10-Q stated:

> As required by the consent orders, the Company submitted to the CFPB and OCC an enterprise-wide compliance risk management plan and a plan to enhance the Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders.  In addition, as required by the consent orders, the Company submitted for non-objection plans to remediate customers affected by the automobile collateral protection insurance and mortgage interest rate lock matters.

90.     On October 12, 2018, Wells Fargo held an earnings conference call with analysts and investors to discuss its third quarter 2018 financial results.  During the call, defendant Sloan touted the Company's efforts relating to its compliance with the regulatory consent orders.  In particular, defendant Sloan stated:

> …*[A]nd we're taking their detailed feedback and making changes across the company, especially in our operational and compliance risk management structure.*  A key milestone in this process is our newly enhanced risk management framework which fundamentally transforms how we manage risk throughout the organization in a comprehensive, integrated, and consistent manner.

91.     On November 6, 2018, Wells Fargo filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2018 (the "Q3 2018 Form 10-Q") with the SEC.  The Q3 2018 Form 10-Q contained signed certifications by defendants Sloan and Shrewsberry pursuant to SOX that "[t]he information contained in the [Q3 2018 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."  The Q3 2018 Form 10-Q reaffirmed the Company's purported commitment to improve its compliance and operational risk management programs.  With respect to Wells Fargo's compliance with the FRS Consent Order, the Q3 2018 Form 10-Q stated:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

As required by the consent order, the Board submitted to the FRB a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the FRB a plan to further improve the Company's compliance and operational risk management program.  The consent order also requires the Company, following the FRB's acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete third-party reviews of the enhancements and improvements provided for in the plans.

92.     With respect to the Company's compliance with the CFPB and OCC Consent Orders, the Q3 2018 Form 10-Q stated:

As required by the consent orders, the Company submitted to the CFPB and OCC an enterprise-wide compliance risk management plan and a plan to enhance the Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders.  In addition, as required by the consent orders, the Company submitted for non-objection plans to remediate customers affected by the automobile collateral protection insurance and mortgage interest rate lock matters, as well as a plan for the management of remediation activities conducted by the Company.

93.     The Q3 2018 Form 10-Q further touted the Company's risk management oversight, adding that "[w]e continue to enhance our oversight of operational and compliance risk management, including as required by the [FRS's Consent Order issued on] February 2, 2018, and the [April 20, 2018 CFPB and OCC Consent Orders]."

94.     On January 15, 2019, Wells Fargo held an earnings conference call with analysts and investors to discuss its fourth quarter 2018 financial results.  During the call, defendant Sloan represented that Wells Fargo had made "meaningful progress" on its compliance with the FRS Consent Order.  In particular, he stated, "[t]here are 2 parts to the consent order: governance oversight and compliance and operational risk management.  We've made meaningful progress on both."  He added that Wells Fargo "[continue[s] to have a constructive dialogue with the Federal Reserve on an ongoing basis to clarify expectations, receive feedback and assess progress."

95.     On February 12, 2019, defendant Shrewsberry participated in the Credit Suisse Financial Services Forum.  During the forum, defendant Shrewsberry touted the Company's "great progress" in its response to the FRS Consent Order.  In particular, he stated:

I think it's taking a little bit longer because it's the first of its kind, and it is sort of an expanding body of work in terms of detail.  *And we're working – it's very constructive, a lot of back and forth, no disagreement on the general direction we're heading in.*  But

there isn't sort of a clear cut case for, first, this happens, then this happens, then that happens.  Even though you might have read it that way, we all might've read it that way in the original letter, it's just a little bit more vague in terms of when completion exists.  But *we're making great progress*, and I think the current sense of end of the year is – seems like a reasonable one while that's happening.

96.    In a March 4, 2019 OCC Quarterly Management Report, the OCC expressed to the Company that its response to date was "*unacceptable*" and stated that its "*management and Board oversight remain inadequate*."

97.    On March 11, 2019, the FRS notified the Company via a Formal Letter that its revised submission was "*riddled with errors and discrepancies, such as incorrect progress indicators for deliverables and 'illogical timeframes.'*"

98.    On March 12, 2019, defendant Sloan testified before the Financial Services Committee during a hearing regarding Wells Fargo's enduring pattern of consumer abuses.  In his opening remarks, defendant Sloan touted the Company's remediation efforts and corporate reforms.  In particular, defendant Sloan stated:

We have discarded our old decentralized structure that allowed prior problems to occur and centralized our enterprise control functions, such as risk, finance, human resources, compliance, and technology.  *We have enhanced our three "lines of defense"—front-line risk, independent risk management, and audit—to ensure multiple layers of review and to improve internal oversight.*  *We have added more than 3,000 new risk professionals who work every day to ensure that we are conducting our business in the best interests of our customers, and we plan to hire more.*  Now, we have better visibility into issues as they emerge and can respond to them more quickly.

We have taken a range of other steps to manage and reduce risk.  *We have reevaluated our products and services, shed riskier investments, and sold or discontinued non-core businesses and activities.*  And we have hired impressive new leaders—many from outside the company—to oversee our Risk, Legal, Human Resources, Technology, and Audit groups.

Our Board of Directors has undergone a similar transformation.  In the past two-and-a-half years, *we have added seven new independent directors, who bring expertise in financial services, risk management, human capital management, technology, operations, and reputational risk.*  We have separated the roles of Chair and CEO, and our new Board Chair Betsy Duke is the first woman to chair a major United States financial institution.  We also improved the reporting and analysis our directors receive, maintained our commitment to the Board's diversity, and further empowered our Board committees to oversee improvements in risk management and corporate culture.

99.     During his testimony, in response to a question concerning the CFPB and OCC Consent Orders, defendant Sloan represented that the Company was "working very constructively with what we have in place and we are executing that plan that reflects the fundamental changes that I have made since I have become the CEO."  Chairwoman Maxine Waters then asked defendant Sloan "whether or not the bank is in compliance, based on reviews that are done by the OCC and the [CFPB]," to which defendant Sloan responded, "*We are in compliance with those plans.*"  In addition, Representative Nydia M. Velázquez asked defendant Sloan about the status of Wells Fargo's compliance with the FRS Consent Order.  In response, defendant Sloan suggested that the Company had completed the required reforms, stating that, "*[a]s part of the consent order with the Fed, they want us to improve the Board and governance oversight, which we have done,*" adding, "*[w]e are significantly improving our compliance and operational risk management.*"

100.    The Financial Services Committee also asked defendant Sloan about the possibility of future scandals emerging.  In response, defendant Sloan represented that Wells Fargo's compliance issues were a thing of the past, stating, "*[t]here is nothing else that I am aware of that we haven't disclosed[.]*"  He further assured that "*the changes that we have implemented, the substantive changes that we have implemented since I've became CEO are going to prevent [scandals] from occurring as best we can.*"  Finally, defendant Sloan stated that Wells Fargo had certain "checks and balances" in place, and that the "likelihood that there would ever be something like a retail sales practices issue happening again at Wells Fargo is very low, if not zero."

101.    Two weeks after defendant Sloan's testimony, on March 28, 2019, Wells Fargo announced defendant Sloan's retirement.  The Company appointed defendant Parker as its Interim CEO and President.  During a conference call held that same day, defendant Sloan stated, "[w]hile I'm confident in my ability to effectively lead Wells Fargo through the work that remains to be done, it has become apparent that the focus on me has become a distraction that impacts our ability to successfully move Wells Fargo forward."

102.    After defendant Sloan's departure, the Company continued to tout its remedial measures and corporate reforms.  For example, on April 12, 2019, Wells Fargo held an earnings conference call with analysts and investors to discuss its first quarter 2019 financial results.  During the call, defendant Parker highlighted Wells Fargo's compliance with the FRS Consent Order.  In particular, he stated:

I think that it's appropriate to say that there was always a sufficient level of seriousness on the part of our Senior Management in terms of approaching the Fed consent order. ***We early on marshaled what we thought were the necessary resources to get everything done and in a manner of appropriate urgency and thoroughness.*** As time has gone on and there's been greater clarity about all the work that's been done and the expectations of the regulators, we've continued to focus on everything that needs to be done. …***[T]he effort that we're talking about, which is enhancing corporate governance protocols, establishing an even stronger risk management framework and achieving true operational excellence*** just takes a certain amount of time and we're doing that methodically, but we're also doing it in conjunction with our regulators as they provide us with constant feedback and the other thing that I will say is that when we're going forward with respect to the asset cap now, one of the things that we feel is critical to do is to get the input of our new Chief Technology Officer and our new Chief Auditor who are going to be – one of whom, our Chief Technology Officer, has just arrived and our Chief Auditor will arrive soon.

103.    On May 3, 2019, Wells Fargo filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2019 (the "Q1 2019 Form 10-Q") with the SEC.  The Q1 2019 Form 10-Q contained signed certifications by defendants Parker and Shrewsberry pursuant to SOX that "[t]he information contained in the [Q1 2019 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."  The Q1 2019 Form 10-Q reiterated the Company's commitment to improve its compliance and operational risk management programs.  With respect to Wells Fargo's compliance with the FRS Consent Order, the Q1 2019 Form 10-Q stated:

As required by the consent order, the Board submitted to the FRB a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the FRB a plan to further improve the Company's compliance and operational risk management program.  The consent order also requires the Company, following the FRB's acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete an initial third-party review of the enhancements and improvements provided for in the plans.

104.    With respect to Wells Fargo's compliance with the CFPB and OCC Consent Orders, the Q1 2019 Form 10-Q stated:

As required by the consent orders, the Company submitted to the CFPB and OCC an enterprise-wide compliance risk management plan and a plan to enhance the Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders.  In addition, as required by the consent orders, the Company submitted for non-objection plans to remediate customers affected by the automobile collateral protection insurance and mortgage interest rate lock matters, as well as a plan for the management of remediation activities conducted by the Company.

105.    On July 16, 2019, the Company held an earnings conference call with analysts and investors to discuss its second quarter 2019 financial results.  During the call, defendant Shrewsberry again highlighted Wells Fargo's focus on compliance and operational risk management, stating that management was "highly focused" on the "very urgent requirements in our risk and control environment." Defendant Shrewsberry further emphasized Wells Fargo's purportedly improved risk department.  In particular, he stated:

> So the risk department is setting policy and looking into businesses and setting expectations for businesses and testing the businesses, but the businesses are controlling their own risks. ... I think our credit risks, our market risk, etc. have been historically very strong and continue to be today.  ***So the newer muscle that's being developed in all of the businesses are these control teams, who go process by process, product by product and transaction flow by transaction flow*** to as Allen said, try and ensure excellence in what we do.  So that we're not generating unexpected operational risk or compliance failures.

106.    Defendant Shrewsberry further commented on the Company's risk and compliance expenditures, stating that "the majority of [the investment spend] is really more on ... compliance and risk management.  But having said that, ***the downside of not being excellent in those areas was -- produced its -- more than its share of cost over the last few years.***  So from an economic perspective, it probably got as high [as a net present value] as anything else that we're doing."

107.    On August 2, 2019, Wells Fargo filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2019 (the "Q2 2019 Form 10-Q") with the SEC.  The Q2 2019 Form 10-Q contained signed certifications by defendants Parker and Shrewsberry pursuant to SOX that "[t]he information contained in the [Q2 2019 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."  The Q2 2019 Form 10-Q again reiterated Wells Fargo's commitment to improve its compliance and operational risk management program.  With respect to the FRS Consent Orders, the Q2 2019 Form 10-Q stated:

> As required by the consent order, the Board submitted to the FRB a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the FRB a plan to further improve the Company's compliance and operational risk management program.  The Company continues to engage with the FRB as the Company works to address the consent order provisions.  The consent order also requires the Company, following the FRB's acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete an initial third-party review of the enhancements and improvements provided for in the plans.

108.    With respect to the CFPB and OCC Consent Orders, the Q2 2019 Form 10-Q stated:

As required by the consent orders, the Company submitted to the CFPB and OCC an enterprise-wide compliance risk management plan and a plan to enhance the Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders.  In addition, as required by the consent orders, the Company submitted for non-objection plans to remediate customers affected by the automobile collateral protection insurance and mortgage interest rate lock matters, as well as a plan for the management of remediation activities conducted by the Company.

109.    On October 15, 2019, Wells Fargo held an earnings conference call with analysts and investors to discuss its third quarter 2019 financial results.  During the call, defendant Parker provided an update on Wells Fargo's compliance with the regulatory consent orders, stating, "[w]ith regard to the issues raised in the Fed consent order, the feedback that we are getting from the Fed on a constant basis is enabling us to continue to make progress in terms of responding to their expectations."

110.    On November 1, 2019, Wells Fargo filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2019 (the "Q3 2019 Form 10-Q") with the SEC.  The Q3 2019 Form 10-Q contained signed certifications by defendants Scharf and Shrewsberry pursuant to SOX that "[t]he information contained in the [Q3 2019 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."  The Q3 2019 Form 10-Q reiterated Wells Fargo's commitment to improve its compliance and operational risk management program.  With respect to the Company's compliance with the FRS Consent Order, the Q3 2019 Form 10-Q stated:

As required by the consent order, the Board submitted to the FRB a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the FRB a plan to further improve the Company's compliance and operational risk management program.  The Company continues to engage with the FRB as the Company works to address the consent order provisions.  The consent order also requires the Company, following the FRB's acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete an initial third-party review of the enhancements and improvements provided for in the plans.

111.    With respect to the Company's compliance with the CFPB and OCC Consent Orders, the Q3 2019 Form 10-Q stated:

As required by the consent orders, the Company submitted to the CFPB and OCC an enterprise-wide compliance risk management plan and a plan to enhance the Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders.  In addition, as required by the consent orders, the Company submitted for non-objection plans to remediate customers affected by the automobile collateral

- 35 -

protection insurance and mortgage interest rate lock matters, as well as a plan for the management of remediation activities conducted by the Company.

**The Company Pays $3 Billion to Settle Criminal and Civil Investigations into the Unlawful Sales Practices**

112.    On February 21, 2020, Wells Fargo agreed to pay $3 billion to resolve criminal and civil investigations into the unlawful sales practices involving the opening of millions of accounts without customer authorization.  In the DOJ press release announcing the multibillion-dollar settlement, one U.S. Attorney stated, "[t]his case illustrates a complete failure of leadership at multiple levels within the Bank. Simply put, Wells Fargo traded its hard-earned reputation for short-term profits, and harmed untold numbers of customers along the way."

<u>**REASONS THE STATEMENTS WERE IMPROPER**</u>

113.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)     the Company was not compliant with the FRS Consent Order nor the CFPB and OCC Consent Orders;

(b)     the Company's remediation plans were inadequate, incomplete, and insufficient to prevent future consumer abuses;

(c)     the Company's remedial measures and risk and compliance management were inadequate to protect against consumer fraud;

(d)     the Company lacked adequate disclosure controls and procedures and internal controls over financial reporting; and

(e)     as a result of the foregoing, the Individual Defendants' representations concerning the Company's business, operations, and financial prospects were improper.

<u>**THE TRUTH EMERGES**</u>

114.    The truth behind the Company's complete failure to comply with regulators and the Individual Defendants' wrongdoing began to emerge on March 4, 2020, when the Financial Services Committee released the Report.  The Report detailed the results of a year-long investigation into Wells

Fargo's noncompliance with five regulatory consent orders, including the FRS Consent Order and the CFPB and OCC Consent Orders.  According to the Report, Wells Fargo had repeatedly failed to satisfy the terms of the consent orders and establish the safeguards necessary to protect consumers from harm.

115.    Regarding the FRS Consent Order, the Report revealed that the risk management plans that Wells Fargo submitted to the FRS in April 2018 were "***materially incomplete***" and fell "***woefully short***" of the FRS's expectations, despite the Company having received constant feedback and guidance from the FRS.  The Report provided further details regarding the Company's incomplete submission.  For example, the FRS found that while "[b]uilding an effective operational risk management program is a key focus of the [FRS Consent Order], ... [t]he plans fail to comprehensively address operational risk[.]"  Indeed, according to the Report, Wells Fargo was informed that its plan was "riddled with errors and discrepancies, such as incorrect progress indicators for deliverables and 'illogical timeframes' for achieving future milestones."

116.    The Report further revealed that Wells Fargo failed to comply with the OCC Consent Order.  According to the Report, the OCC rejected Wells Fargo's original submission on June 19, 2018.  The OCC noted that the Company's remediation plan "lacks substance and detail in a number of areas," including its plan to "remediat[e] customers affected by Wells Fargo's force-placed insurance practices."  The OCC instructed the Company to resubmit its plan to enhance its internal audit functions and threatened future enforcement actions.  Further, the OCC admonished the Company's "very slow" progress.  In particular, according to the Report, the OCC stated:

> Although the bank is making progress in certain areas, significant time elapsed before the bank began demonstrating progress, and overall, progress is very slow.  Additionally, ***the vast majority of progress appears to come after repeated pressure by the regulators, calling out missed deadlines, failed validations, and poor quality [sic] action plans.***  The Board and executive management must demonstrate the willingness and ability to implement and maintain effective corporate governance and risk management programs that span the enterprise.

117.    The Report concluded that the Company's risk management infrastructure remains broken and woefully inadequate to prevent future harm to consumers.  Accordingly, the "time has come for Congress to compel regulators to be more aggressive with regard to megabanks like Wells Fargo in using the supervisory tools and sanctions available to them."  Moreover, the Report recommended that Congress

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

"consider legislation mandating that regulators immediately direct a recidivist megabank like Wells Fargo to remove complacent and ineffective directors ... and compel regulators to either (a) downsize Wells Fargo…, or (b) wind down the bank[.]"

118.    On this news, Wells Fargo's market capitalization plunged more than 21.55%, or $8.92 per share, on March 9, 2020, to close at $32.48 per share compared to the closing of $41.40 per share on March 4, 2020, erasing more than $36.5 billion in market capitalization in just three trading days.

119.    On March 10, 2020, defendant Scharf testified before the Financial Services Committee. In his opening remarks, defendant Scharf admitted that Wells Fargo has "not yet done what is necessary to address [its] shortcomings," noting that the Company's "culture was broken."  In particular, he stated:

> [W]e had a flawed business model in how the company was managed.  Our structure was problematic, and the company's leadership failed its stakeholders.  Our culture was broken, and we did not have the appropriate controls in place across the company.

120.    Following defendant Scharf's testimony, Chairwoman Waters, via a letter to Attorney General William Barr, requested that the Department of Justice review defendant Sloan's testimony during the Committee hearing held a year earlier on March 12, 2019, for a potential violation of the federal law prohibiting knowingly and willfully making a false statement to Congress.

121.    On this news, Wells Fargo's market capitalization fell $2.75 per share, on March 11, 2020, to close at $32.33 per share compared to the previous trading day's closing of $35.08 per share, erasing another $11 billion in market capitalization in a single trading day.

## THE FALSE AND MISLEADING 2018 PROXY

122.    Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

123.    On March 14, 2018, defendants Clark, Craver, James, Morris, Pujadas, Sargent, Sloan, and Vautrinot caused Wells Fargo to file with the SEC its 2018 Proxy in connection with the 2018 Annual Meeting of Shareholders, which was held on April 24, 2018.  In the 2018 Proxy, defendants Clark, Craver, James, Morris, Pujadas, Sargent, Sloan, and Vautrinot solicited stockholder votes to, among other things:

(i) reelect themselves to the Board; (ii) reject a stockholder proposal for the Company to engage multiple outside independent experts or resources from the general public to reform its executive compensation policy with social responsibility; and (iii) reject a stockholder proposal for the Board to prepare a report, to be issued to stockholders, on the Company's employee incentive compensation and the risk of material losses.

124.    As described above, the 2018 Proxy contained false and misleading statements.  In the 2018 Proxy, the Company provided an update on its reforms and remediation plans, stating that "the [B]oard and senior management are committed to satisfying the requirements of the [FRS] consent order." In addition, the Company reiterated its commitment to reviewing its internal procedures.  In particular, the 2018 Proxy stated:

> As part of our transformation, Wells Fargo is committed to a thorough review of the products we offer and the internal procedures we use to get things done.  When we uncover anything that may be questionable, we address it and remediate any customers who may have been financially harmed.  To strengthen Wells Fargo's corporate culture, we are listening to our team members and inviting outside reviewers to help identify enhancements so we can make sure our culture is consistent across the organization.

125.    The 2018 Proxy harmed Wells Fargo by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of the defendants' misleading statements in the 2018 Proxy, Wells Fargo's stockholders voted to reelect defendants Clark, Craver, James, Morris, Pujadas, Sargent, Sloan, and Vautrinot.

126.    In addition, the 2018 Proxy contained two stockholder proposals, Items 5 and 6, demanding that the Company engage independent experts to reform its executive compensation policy with social responsibility, and calling for the Board to prepare a report on the Company's employee incentive compensation and the risk of material losses.  Under Item 5, the stockholders noted that "[t]he current Wells Fargo executive compensation policy is not socially responsible, as shown from the case of the forfeited $41 million from the former CEO.  It does not include social elements beyond the narrow market consideration, such as the rising of the CEO-worker pay ratio, to measure the executive compensation." As Item 5 provided, "[a] socially responsible executive compensation policy is essential to corporate social responsibility."  In particular, Item 5 stated:

**Resolution**

Resolved: shareholders recommend that Wells Fargo & Company engage multiple outside independent experts or resources from the general public to reform its executive compensation policy with social responsibility.

**Supporting Statement**

A socially responsible executive compensation policy is essential to corporate social responsibility. Wells Fargo does not have a compensation committee. "The HRC [Human Resource Committee] retained FW Cook to provide independent advice on executive compensation matters for 2016.| (2017 Proxy Statement, p.59). It is obvious that a paid consulting firm cannot provide any independent voice which the company does not want to hear. For example, Apple Inc. wasted the company money to hire a consulting firm to advise Apple to award the same $1,000,000 salary, the same $20,000,105 stock and the same $4,000,000 non-equity incentive plan compensation each in 2015 to its five named executive officers. The current Wells Fargo executive compensation policy is not socially responsible, as shown from the case of the forfeited $41 million from the former CEO. It does not include social elements beyond the narrow market consideration, such as the rising of the CEO-worker pay ratio, to measure the executive compensation.

"A man must always live by his work, and his wages must at least be sufficient to maintain him." (Adam Smith, The Wealth of Nations "Book 1 Chapter 8 Of the Wages of Labour," 1776.) However, citing Economic Policy Institute, the Wall Street Journal reported: "The ratio has ballooned since the 1970s: The bosses of America's 350 largest companies made on average 276 times the money of their rank-and-file subordinates in 2015, up from 30 times in 1978." ("CEO-Worker Pay Ratio Generates Outrage— And Some Insight" by Stephen Wilmot, July 6, 2017) Furthermore, "Summary compensation tables massively understate what executives earn and don't tell investors what they need to know." "In 2015—the last year for which full data is available—the average pay of the 500 highest-paid U.S. executives was $17.1 million according to fair-value estimates, but $32.6 million according to realized pay." ("Better Ways to Measure Your Boss's Pay" by Stephen Wilmot, July 4, 2017.) This rising trend of inequality is not only socially immoral but also economically unsustainable.

For the purpose of this proposal, the HRC has the flexibility to select multiple independent experts or sources and social elements, such as the CEO-worker pay ratio of Wells Fargo and the average employee's pay, the minimum wage, and jobless rate of America. For example, Intel accepted my advice and organized three meetings to receive true independent insights from outside experts (including an UN officer, a federal officer, an Australian professor, a British journalist, an activist, NPO researchers, a lawyer, and shareholders) to review its human rights principles and employee's code of conduct policy.

127.    The Board recommended that stockholders vote ***against*** Item 5. In support of its recommendation, the Board asserted that its executive compensation program "encourage[s] long-term shareholder value," that the Board "consider[] a variety of factors, including ... executive accountability,

and other social responsibility issues," and that the Board is "committed to paying our team members fairly and consistent with social responsibility."  In particular, supplying the reasoning for stockholders to vote against Item 5, the 2018 Proxy stated:

> • Our executive compensation program is designed to pay for performance and encourage long-term shareholder value;
>
> • In evaluating executive performance and determining executive compensation, the [Board's Human Resources Committee] considers a variety of factors, including ethical considerations, diversity and inclusion, executive accountability, and other social responsibility issues;
>
> • The Board's Human Resources Committee is comprised of independent directors and seeks independent advice; and
>
> • We are committed to paying our team members fairly and consistent with social responsibility.

128.     The statements in the 2018 Proxy regarding the Board's commitment to considering social responsibility in evaluating executive performance and determining executive compensation were false and misleading.  As described herein, the Board consistently failed to monitor Wells Fargo's risk and compliance programs and submitted severely deficient remediation plans to regulators.  Thus, the Board could not reasonably consider social responsibility in determining executive pay while it allowed Wells Fargo to repeatedly commit irreparable consumer abuses.

129.     Further, under Item 6, the stockholders noted that "Congress directed federal regulators to examine the financial incentives of all bank employees-not just executives-whose actions can threaten the safety of individual banks or the banking system itself."  Yet, "[a]lthough Wells Fargo discloses the compensation of named executive officers, it does not disclose information regarding the compensation of other employees who could expose our company to material losses."  Given the Company's significant risk exposure due to its ethical failures, the stockholders proposed that the Board prepare a report on incentive compensation and Wells Fargo's risks of material losses.  In particular, Item 6 stated:

**RESOLVED:**

Shareholders request that the Board prepare a report, at reasonable cost, disclosing to the extent permitted under applicable law and Wells Fargo's contractual, fiduciary or other obligations (1) whether the Company has identified employees or positions, individually or as part of a group, who are eligible to receive incentive-based compensation that is tied

to metrics that could have the ability to expose Wells Fargo to possible material losses, as determined in accordance with generally accepted accounting principles; (2) if the Company has not made such an identification, an explanation of why it has not done so; and (3) if the Company has made such an identification, the:

(a) methodology and criteria used to make such identification;

(b) number of those employees/positions, broken down by division;

(c) aggregate percentage of compensation, broken down by division, paid to those employees/positions that constitutes incentive-based compensation; and

(d) aggregate percentage of such incentive-based compensation that is dependent on (i) short-term, and (ii) long-term performance metrics, in each case as may be defined by Wells Fargo and with an explanation of such metrics.

The requested report would provide shareholders with important information concerning incentive-based compensation that could lead employees to take inappropriate risks that could result in material financial loss to our company.

**Supporting Statement**

A lesson from the financial crisis was that employees at large banks, not just top executives, can make decisions that may affect the stability of our portfolio companies and the economy. In response, Congress directed federal regulators to examine the financial incentives of all bank employees-not just executives-whose actions can threaten the safety of individual banks or the banking system itself.

Section 956 of the Dodd-Frank Act requires federal regulators to promulgate disclosure requirements relating to "the structures of all incentive-based compensation arrangements...that could lead to material financial loss." A Notice of Proposed Rule Making and Request for Comment released by the SEC in 2016 states, "Well-structured incentive-based compensation arrangements can promote the health of a financial institution by aligning the interests of executives and employees with those of the institution's shareholders and other stakeholders. At the same time, poorly structured incentive-based compensation arrangements can provide executives and employees with incentives to take inappropriate risks that are not consistent with the long-term health of the institution and, in turn, the long-term health of the U.S. economy." Basel III, the global banking regulatory reform standard, urges banks to identify material risk takers other than executives and disclose their fixed and variable remuneration.

Although Wells Fargo discloses the compensation of named executive officers, it does not disclose information regarding the compensation of other employees who could expose our company to material losses. Because investors, like regulators, have significant interests in understanding risks that could expose Wells Fargo to material losses, Wells Fargo should disclose this information to its shareholders.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

130.    The Board recommended that stockholder vote *against* Item 6.   In support of its recommendation, the Board asserted that the Company "already undertakes incentive compensation risk reviews responsive to the proposal's concerns," that the Board oversees such review, and that its incentive compensation risk management program has "significantly expanded and strengthened in recent years." In particular, supplying the reasoning for stockholders to vote against Item 6, the 2018 Proxy stated:

> • Our Company already undertakes incentive compensation risk reviews responsive to the proposal's concerns through its Incentive Compensation Risk Management (ICRM) program;
>
> • The Board's Human Resources Committee oversees the ICRM program, which we have significantly expanded and strengthened in recent years; and
>
> • Through the ICRM program, we review the incentive compensation arrangements of all incentive-eligible roles across our Company for a broad range of actual and potential financial, reputational, and regulatory risks.

131.    The statements in the 2018 Proxy regarding the Board's oversight and review of the Company's incentive compensation risk, and the strength of the program, were false and misleading.  As described herein, the Board's consistently failed to monitor Wells Fargo's risk and compliance programs, leading to substantial consumer harm.  As a result, even after the numerous scandals broke, the Company's employees were still incentivized to continue their unlawful sales practices due to the unethical tone at the top.

132.    As a result of these misleading statements, the Company's stockholders voted against Items 5 and 6 without adequate information necessary to make a reasonably informed decision.

### THE COMPANY ENGAGES IN A SCHEME TO DEFRAUD SMALL BUSINESS OWNERS IN CONNECTION WITH THEIR LOAN APPLICATIONS

133.    In the midst of the Individual Defendants' wrongdoing related to their failures to comply with the regulatory consent orders and their scheme to downplay heightened credit risks and artificially inflate financial growth, Wells Fargo, once again, prioritized corporate profits at the expense of its own customers.  Specifically, the Company engaged in a scheme to manipulate a federally-funded lending program that was designed to assist small businesses in need during a global crisis.

134.    On March 11, 2020, the World Health Organization declared a worldwide pandemic due to the COVID-19 outbreak.  Around that time, several states began to issue executive stay-at-home orders

to slow the spread of COVID-19.  In response to the economic fallout of the crisis, the U.S. Senate passed the CARES Act.  On March 27, 2020, President Donald J. Trump signed the CARES Act into law.

135.    As part of the CARES Act, Congress appropriated $349 billion in funds to the SBA.  The funds were meant to fund the PPP, so that small businesses could obtain loans to cover payroll and avoid massive layoffs due to the crisis.  The PPP intended to provide small businesses with eight weeks of assistance through federally guaranteed loans.  Indeed, the express intent of Congress in passing the CARES Act was that the funds would be used to support small businesses, particularly rural businesses, veteran-owned business, woman-owned businesses, and businesses owned by socially and economically disadvantaged persons.  Any small business with five hundred or fewer employees may be eligible.

136.    The PPP loans began to be dispersed on April 3, 2020.  Notably, the loans would be administered by private banks, such as Wells Fargo, through their existing lending programs.  Thus, small businesses seeking PPP loans would submit their applications through the banks.

137.    The U.S. Department of Treasury detailed the terms of the PPP for lenders.[1]  Specifically, the PPP offered large commissions of 1% to 5% of the loan amount:

> **How will lenders be compensated?** Processing fees will be based on the balance of the financing outstanding at the time of final disbursement.  SBA will pay lenders fees for processing PPP loans in the following amounts:
>
> • Five (5) percent for loans of not more than $350,000;
> • Three (3) percent for loans of more than $350,000 and less than $2,000,000; and
> • One (1) percent for loans of at least $2,000,000.[2]

Thus, smaller loans resulted in smaller commissions for Wells Fargo.  The Company was therefore incentivized to favor bigger customers, particularly those with pre-existing lending relationships with Wells Fargo, in order to maximize commissions for the least of amount of work.  Still, the SBA mandated that the funds be distributed on a "first-come, first-served" basis.[3]

---

[1] U.S. Department of Treasury, *Paycheck Protection Program (PPP) Information Sheet for Lenders*, https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf?

[2] *Id.*

[3] SBA, Interim Final Rule §m, 13 CFR Part 120 [Docket No. SBA-2020-0015] RIN 3245-AH3, *Business Loan Program Temporary Changes; Paycheck Protection Program* (Apr. 15, 2020), https://home.treasury.gov/system/files/136/PPP--IFRN%20FINAL.pdf.

138.     The Company urged small businesses to apply, publicly stating that it would focus its attention on small businesses and nonprofits and that it would conform its conduct to the "terms of the program," including processing applications on a first-come, first-served basis.  For example, on April 5, 2020, Wells Fargo issued a press release titled "Wells Fargo Receives Strong Interest in the Paycheck Protection Program (PPP)."  In its press release, the Company highlighted that it "has reached its capacity of $10 billion to lend under the PPP," that it "[w]ill focus lending to nonprofits and small businesses with fewer than 50 employees," and that it "[w]ill give fees received under program to nonprofits focused on small business."  Defendant Scharf commented in the press release, touting that, "[s]ince the beginning of this health crisis, Wells Fargo has provided substantial credit and liquidity to [its] customers to help them weather these uncertain times."  Defendant Scharf further emphasized that "we are focusing our efforts under the [PPP]" on "small businesses with fewer than 50 employees and nonprofits [that] often have fewer resources."  In particular, the press release stated:

> Since the beginning of this health crisis, Wells Fargo has provided substantial credit and liquidity to our customers to help them weather these uncertain times.  In the month of March alone, we extended nearly $70 billion in new and increased commitments and outstanding loans to customers including consumers, small businesses, and companies in the US.  In addition, we have deferred more than 700,000 payments, representing almost $1.8 billion, and provided over 750,000 fee waivers, exceeding $28 million, for our customers impacted by this event.
>
> Today, the company continues to operate in compliance with an asset cap imposed by its regulator due to actions of past leadership. While we are actively working to create balance sheet capacity to lend, we are limited in our ongoing ability to use our strong capital and liquidity position to extend additional credit. Since I arrived at the company, I have been clear that we will direct all resources necessary to do the work required by our regulators and we are in the process of doing so.
>
> We are committed to helping our customers during these unprecedented and challenging times, but are restricted in our ability to serve as many customers as we would like under the PPP.  While all businesses have been impacted by this crisis, small businesses with fewer than 50 employees and nonprofits often have fewer resources.  Therefore, we are focusing our efforts under the Paycheck Protection Program on these groups," said Wells Fargo CEO Charlie Scharf.

139.     On April 8, 2020, Wells Fargo issued a press release titled "Wells Fargo to Expand Participation in the [PPP]."  In the press release, the Company announced that the FRS would allow Wells Fargo to exceed the asset cap imposed pursuant to the FRS Consent Order.  As a result, the Company

stated that it "will expand its participation in the [PPP] and offer loans to a broader set of its small business and nonprofit customers *subject to the terms of the program*."  Defendant Scharf commented in the press release, reiterating that the Individual Defendants were taking their remediation efforts to comply with the regulatory consent orders seriously, and that they were actively ensuring the future compliance of the Company with all necessary requirements.

140.    On April 14, 2020, Wells Fargo held an earnings conference call with analysts and investors to discuss its first quarter of 2020 financial results.  During the call, defendant Scharf stated that defendants "extended [their] participation in the PPP program and hope to provide significant relief" to their "processing capacity to respond to the significant demand [they]'ve seen."  Defendant Scharf further stated that, through April 10, 2020, Wells Fargo "received more than 370,000 indications of interest from [its] customers."  He added, Defendants "are working with industry groups and the U.S. Treasury in preparation to distribute millions of economic impact payments to Americans as quickly as possible."

141.    The above statements were each misleading because they failed to disclose that the Company was unfairly prioritizing higher loans for bigger companies, despite the SBA requirement that loans be processed on a first-come, first-served basis.

142.    The truth about the Company's unfair lending practices began to emerge on April 19, 2020, when several small business owners filed a class action lawsuit in the U.S. District Court for the Central District of California against Wells Fargo alleging that the Company unfairly allocated PPP loans to generate larger loan origination fees.  While thousands of small businesses trusted that Wells Fargo would process the applications on a first-come, first-served basis, the Company instead chose corporate greed and prioritized PPP applications with higher loans for bigger companies.  Further, "[m]aking matters worse, Wells Fargo concealed from the public that it was reshuffling the PPP applications it received and prioritizing the applications that would make the bank the most money."

143.    *USA Today* reported on the lawsuit that same day in an article titled "Lawsuit Alleges Wells Fargo Unfairly Shuffled Paycheck Protection Program Applications."  As the article described, "[t]he lawsuit filed on behalf of small business owners on Sunday alleges that Wells Fargo unfairly prioritized businesses seeking large loan amounts, while the government's small business agency has said that PPP

loan applications would be processed on a first-come, first-served basis."  The article added that, "[t]he move by Wells Fargo meant that the bank would receive millions more dollars in processing fees."

144.     Class Actions Reporter also reported on the lawsuit, noting that Wells Fargo may have violated the CARES Act.  In particular, the Class Actions Reporter stated:

> The complaint quotes the text of the bill as saying, "[T]he Administrator should issue guidance to lenders and agents to ensure that the processing and disbursement of covered loans prioritizes small business concerns and entities in the underserved and rural markets, including veterans and members of the military community, small business concerns owned and controlled by socially economically disadvantaged individuals…, women, and business in operation for less than 2 years."

> Wells Fargo claimed to back this priority. The complaint quotes its CEO as saying, "While all businesses have been impacted by this crisis, small businesses with fewer than 50 employees and nonprofits often have fewer resources.  Therefore, we are focusing our e☐orts under the Paycheck Protection Program on these groups."

> However, the complaint alleges that this was not how Wells Fargo handled the applications it received: "Wells Fargo prioritized and front-loaded applications with higher loan amounts.  This shown by comparing data from loans processed between April 3, 2020 (when the PPP started) and April 13th and April 16th (when the program ran out of money)."

> According to the complaint, Wells Fargo did this because it earned higher fees on those loans.

> Wells Fargo's words matters, the complaint says, because small businesses were entitled to apply only for one loan.  If they applied with one bank, they could not then submit another application with another.  Had they known that Wells Fargo would prioritize larger businesses, they would have applied with a different lender.

145.     On this news, Wells Fargo's market capitalization fell $1.85 per share, on April 23, 2020, to close at $26.53 per share compared to the closing of $28.38 per share on April 17, 2020, erasing another $7.5 billion in market capitalization in just four trading days.

146.     Shortly thereafter, several other small businesses stepped forward seeking damages and injunctive relief related to the Company's dishonest conduct.  On May 5, 2020, Wells Fargo filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2020 (the "Q1 2020 Form 10-Q") with the SEC.  The Q1 2020 Form 10-Q disclosed that the Company has been named in putative class actions "in state and federal court in Texas, California, and Colorado."  In addition, the Q1 2020 Form 10-Q disclosed that "*[t]he Company has also received formal and informal inquiries from federal and state*

*governmental agencies regarding its offering of PPP loans*."  In particular, the Q1 2020 Form 10-Q stated:

> **CORONAVIRUS AID, RELIEF, AND ECONOMIC SECURITY ACT/PAYMENT PROTECTION PROGRAM**
> Plaintiffs have filed putative class actions in state and federal court in Texas, California, and Colorado against the Company. The actions seek damages and injunctive relief related to the Company's offering of Paycheck Protection Program (PPP) loans under the Coronavirus Aid, Relief, and Economic Security Act. The Company has also received formal and informal inquiries from federal and state governmental agencies regarding its offering of PPP loans.

147.    On this news, Wells Fargo's market capitalization fell $2.12 per share, on May 7, 2020, to close at $25.23 per share compared to the closing of $27.35 per share on May 4, 2020, erasing another $8.6 billion in market capitalization in just three days.

## THE INDIVIDUAL DEFENDANTS MAKE IMPROPER STATEMENTS REGARDING THE COMPANY'S COMMERCIAL CREDIT LENDING PRACTICES AND RISK

148.    The Company's pervasive and abusive culture has only continued, as more information about the Individual Defendants' repeated attempts to mislead the public continues to be revealed.  The Individual Defendants are again responsible for a series of improper statements, this time concerning the credit quality of Wells Fargo's commercial credit portfolios and the Company's underwriting and due diligence practices.  Specifically, between October 13, 2017 and October 14, 2020, the Individual Defendants made false or misleading statements claiming that Wells Fargo's commercial credit portfolios were of exceptional credit quality and that the Company deployed industry-leading underwriting and due diligence policies and procedures when processing these loans.  Since 2009, Wells Fargo has rapidly grown its commercial credit portfolio by hundreds of billions of dollars.  Indeed, between December 2009 and December 2019, the Company's commercial loan balance increased by more than $200 billion, or 68%.

149.    In truth, however, Wells Fargo fueled its rapid commercial loan growth by lending to businesses that posed a heightened risk of default.  Then, the Company systematically concealed these credit risks by artificially inflating the incomes generated by borrowing businesses, failing to follow proper underwriting procedures, and evading applicable risk controls.  Making matters worse, Wells Fargo exacerbated the threat of its commercial debt by packaging the loans into collateralized loan obligations

("CLOs") and commercial mortgage-backed securities, and then widely distributing these securitized products throughout the financial system.  As a result, the Individual Defendants' representations of the quality of Wells Fargo's commercial credit portfolios, as well as its artificially inflated financial statements, were misleading.

150.    On October 13, 2017, Wells Fargo issued a press release announcing its financial results for the third quarter of 2017.  In the press release, the Company touted its "solid credit quality," while announcing it generated $4.6 billion in net income during the quarter.  The Company further stated that the period-end loan balances for Wells Fargo's commercial loans were $500 billion, "reflecting paydowns and continued underwriting discipline," and claimed net charge-offs in its commercial portfolio of just 0.09% of the average loan balance.  The Company's Chief Risk Officer further touted that "[c]redit results remained strong in the third quarter," and that "[t]he loan portfolio continued to perform well, led by ... continued solid performance in the commercial portfolio."

151.    On November 3, 2017, Wells Fargo filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q") with the SEC.  The Q3 2017 Form 10-Q contained signed certifications by defendants Sloan and Shrewsberry pursuant to SOX that "[t]he information contained in the [Q3 2017 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."  The Q3 2017 Form 10-Q reiterated the Company's position that "[s]olid credit quality continued in the third quarter 2017, as our net charge-off rate remained low at 0.30% (annualized) of average total loans."  In particular, the Q3 2017 Form 10-Q stated:

**Credit Quality**

Solid overall credit results continued in third quarter 2017 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus.  Net charge-offs were $717 million, or 0.30% (annualized) of average loans, in third quarter 2017, compared with $805 million a year ago (0.33%). The decrease in net charge-offs in third quarter 2017, compared with a year ago, was driven by lower losses in the commercial and industrial loan portfolio, including in the oil and gas portfolio.  Our total oil and gas loan exposure, which includes unfunded commitments and loans outstanding, was down 8% from a year ago.

Our commercial portfolio net charge-offs were $113 million, or 9 basis points of average commercial loans, in third quarter 2017, compared with net charge-offs of $215 million, or 17 basis points, a year ago.

... Our commercial real estate portfolios were in a net recovery position for the 19th consecutive quarter, reflecting our conservative risk discipline and improved market conditions….

The allowance for credit losses as of September 30, 2017, decreased $585 million compared with a year ago and decreased $431 million from December 31, 2016.  The allowance for credit losses at September 30, 2017 included $450 million for coverage of our preliminary estimate of potential hurricane-related losses from Hurricanes Harvey, Irma and Maria.  The allowance coverage for total loans was 1.27% at September 30, 2017, compared with 1.32% a year ago and 1.30% at December 31, 2016. The allowance covered 4.3 times annualized third quarter net charge-offs, compared with 4.0 times a year ago.  Future allowance levels will be based on a variety of factors, including loan growth, portfolio performance and general economic conditions.  Our provision for loan losses was $717 million in third quarter 2017, down from $805 million a year ago, primarily reflecting improvement in the oil and gas portfolio.

Nonperforming assets decreased $512 million, or 5%, from June 30, 2017, the sixth consecutive quarter of decreases, with improvement across our consumer and commercial portfolios and lower foreclosed assets.  Nonperforming assets were only 0.98% of total loans, the lowest level since the merger with Wachovia in 2008.  Nonaccrual loans decreased $437 million from the prior quarter primarily due to a $276 million decrease in commercial nonaccruals.  In addition, foreclosed assets were down $75 million from the prior quarter.

152.    On January 12, 2018, Wells Fargo issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2017.  In the press release, the Company announced $6.2 billion in net income on $22 billion of revenue during the fourth quarter.  In addition, the Company stated that its period-end loan balances for commercial loans totaled $503 billion, and that Wells Fargo only had $115 million in net charge-offs in its commercial portfolio during the quarter, or just 0.09% of the average loan balance.  Defendant Sloan commented in the press release, stating that "[t]he progress we made over the past year was evident in the fourth quarter in ... loan growth particularly in commercial loans."

153.    That same day, the Company held an earnings conference call with analysts and investors to discuss its fiscal 2017 financial results.  During his opening remarks, defendant Sloan emphasized Wells Fargo's "historically low credit losses."  Similarly, during defendant Shrewsberry's prepared remarks, he touted the Company's "continued credit discipline in a very competitive market," in reference to Wells

Fargo's commercial real estate loan portfolio.  Defendant Shrewsberry added, "Our credit quality remained exceptionally strong.  Our loss rate for the full year was among the lowest in our history, and in the fourth quarter, our loss rate was 31 basis points of average loans."

154.   During the call, defendant Sloan stated that Wells Fargo was responsibly growing its commercial real estate lending platform.  In particular, he stated:

> I mean, we're the largest commercial real estate lender by far, and not only in total but in almost every product type.  And we have the most diverse and broadcast commercial real estate platform in the market.  We are committed to this business long term.  But to be committed to the real estate business long term, you need to also make important and disciplined decisions when you see that you're at a period in the cycle that doesn't last forever but a period in the cycle where I think that credit – underwriting standards or pricing might be a little bit out of balance.  I mean, that's how you get to stay in this business through cycles because you make good decisions.  So we want to grow this book, but we want to grow it in a way that is – makes the right decision for our shareholders.  So what we've seen this year is an increase in competition, slightly lower in credit spreads – or standards, excuse me, and a little bit more aggressive pricing, and that's meant that our book has declined a little bit.  But again, we've got a balanced business here, and so our real estate capital markets business has absolutely been on fire, and you can see that in other parts of the – of revenues in the company.  So I wouldn't look at this as we're kind of purposely rolling down this book because we don't like the business.  We love the business.  We want to grow it.  We want to grow it so that we are ready for next year and the next cycle.

155.   On March 1, 2018, Wells Fargo filed its Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K") with the SEC.  Defendants Sloan, Shrewsberry, Clark, Craver, James, Morris, Pujadas, Sargent, and Vautrinot each signed the 2017 Form 10-K.  The 2017 Form 10-K incorporated the Company's financial results contained in its January 12, 2018 press release.  The 2017 Form 10-K also stated that Wells Fargo's "[c]redit quality improved in 2017, as our net charge-off rate remained low at 0.31% of average total loans," and that it held $35.7 billion in CLOs for sale and an additional $661 million in CLOs held-to-maturity as of December 31, 2017.

156.   The 2017 Form 10-K further touted the Company's credit quality, "driven by continued strong performance in the commercial and consumer real estate portfolios."  In particular, the 2017 Form 10-K stated:

**Credit Quality**

Credit quality remained solid in 2017, driven by continued strong performance in the commercial and consumer real estate portfolios.  Performance in several of our commercial and consumer loan portfolios remained near historically low loss levels and reflected our

long-term risk focus.  Net charge-offs of $2.9 billion were 0.31% of average loans, compared with $3.5 billion and 0.37%, respectively, from a year ago.  Net losses in our commercial portfolio were $446 million, or 9 basis points of average loans, in 2017, compared with $1.1 billion, or 22 basis points, in 2016.  Our commercial real estate portfolios were in a net recovery position for each quarter of the last five years, reflecting our conservative risk discipline and improved market conditions.

*        *        *

The allowance for credit losses of $12.0 billion at December 31, 2017, was down $580 million compared with the prior year.  Our provision for credit losses in 2017 was $2.5 billion compared with $3.8 billion a year ago reflecting a release of $400 million in the allowance for credit losses, compared with a build of $250 million in 2016.  The build in 2016 was primarily due to deterioration in the oil and gas portfolio, while the release in 2017 was due to strong underlying credit performance.

Nonperforming assets (NPAs) at the end of 2017 were down $2.7 billion, or 24%, from the end of 2016.  Nonaccrual loans declined $2.3 billion from the prior year end while foreclosed assets were down $336 million from 2016.

157.    On April 13, 2018, Wells Fargo issued a press release announcing its financial results for the first quarter of 2018.  In the press release, the Company stated that, during the first quarter, it generated $5.9 billion in net income on $21.9 billion of revenue.  The Company added that the period-end loan balances for commercial loans totaled $503 billion, and net charge-offs amounted to just $78 million, or 0.06%, of the average loan balance.

158.    That same day, Wells Fargo held an earnings conference call with analysts and investors to discuss the first quarter of 2018 results.  During the call, defendant Sloan touted the first quarter results, stating they "included continued strong credit performance."  Similarly, defendant Shrewsberry stated, "[w]e've also maintained our credit risk discipline for new originations in Commercial Real Estate during a period of high liquidity and increased competition, resulting in 4 consecutive quarters of lower balances."

159.    On May 4, 2018, Wells Fargo filed the Q1 2018 Form 10-Q with the SEC.  The Q1 2018 Form 10-Q contained signed certifications by defendants Sloan and Shrewsberry pursuant to SOX that "[t]he information contained in the [Q1 2018 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."  The Q1 2018 Form 10-Q stated that "[s]olid credit quality continued in first quarter 2018, as our net charge-off rate remained low at 0.32% (annualized) of average total loans."  The Q1 2018 Form 10-Q added that the Company held $36.4 billion in CLOs for sale and $567 million in CLOs held-to-maturity as of the end of the quarter.  The Q1 2018

- 52 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Form 10-Q further touted the Company's credit quality, which was purportedly "driven by continued strong performance in the commercial and consumer real estate portfolios."  In particular, the Q1 2018 Form 10-Q stated:

**Credit Quality**

Solid overall credit results continued in first quarter 2018 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus.  Net charge-offs were $741 million, or 0.32% (annualized) of average loans, in first quarter 2018, compared with $805 million a year ago (0.34%).  The decrease in net charge-offs in first quarter 2018, compared with a year ago, was driven by lower losses in the commercial and industrial loan portfolio, including in the oil and gas portfolio.

Our commercial portfolio net charge-offs were $78 million, or 6 basis points of average commercial loans, in first quarter 2018, compared with net charge-offs of $143 million, or 11 basis points, a year ago.  ...Our commercial real estate portfolios were in a net recovery position for the 21st consecutive quarter, reflecting our conservative risk discipline and improved market conditions.  Net losses on our consumer real estate portfolios improved by $56 million, or 187%, to a net recovery of $26 million from a year ago, reflecting the benefit of the continued improvement in the housing market and our continued focus on originating high quality loans.

\*     \*     \*

The allowance for credit losses as of March 31, 2018, decreased $974 million compared with a year ago and decreased $647 million from December 31, 2017.

\*     \*     \*

Nonperforming assets decreased $388 million, or 4%, from December 31, 2017, the eighth consecutive quarter of decreases, with improvement across our consumer and commercial portfolios and lower foreclosed assets.  Nonperforming assets were 0.88% of total loans, the lowest level since the merger with Wachovia in 2008.  Nonaccrual loans decreased $317 million from the prior quarter largely due to a decrease in commercial nonaccruals.  In addition, foreclosed assets were down $71 million from the prior quarter.

160.    On July 13, 2018, Wells Fargo issued a press release announcing its financial results for the second quarter of 2018.  In its press release, the Company stated that it generated $5.2 billion in net income on $21.6 billion of revenue during the second quarter.  The Company added that its period-end commercial loan balances totaled $503 billion and that it had just $67 million, or 0.05%, of the average loan balance in net-charge-offs in its commercial portfolio during the second quarter.

161.    That same day, Wells Fargo held an earnings conference call with analysts and investors to discuss the second quarter results.  During the call, defendant Sloan stated that "[w]e've committed to transform how we manage risk at Wells Fargo, and our goal is not only to meet, but exceed regulatory expectations so that we have the best risk management in the industry."  He further touted the Company's credit quality as an example of its "strong track record of managing many of our risks."  Defendant Shrewsberry added that Wells Fargo conducted a "$150 million reserve release reflecting strong overall portfolio credit performance and lower balances."  Defendant Shrewsberry similarly touted Wells Fargo's "continued credit discipline" and "strong credit performance."

162.    On August 1, 2018, Wells Fargo issued a press release disclosing that it will pay over $2 billion to settle charges with the DOJ regarding claims related certain residential mortgage-backed securities activities the Company engaged in between 2005 and 2007.  Defendant Sloan commented in the press release claiming that Wells Fargo had put such unlawful practices behind it.  In particular, the press release stated:

> "We are pleased to put behind us these legacy issues regarding claims related to residential mortgage-backed securities activities that occurred more than a decade ago," said Wells Fargo CEO Tim Sloan.  "Wells Fargo remains focused on our important role as one of the nation's leading providers of mortgage financing and on our commitment to expanding sustainable homeownership opportunities for our customers."

163.    On August 3, 2018, Wells Fargo filed the Q2 2018 Form 10-Q with the SEC.  The Q2 2018 Form 10-Q contained signed certifications by defendants Sloan and Shrewsberry pursuant to SOX that "[t]he information contained in the [Q2 2018 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."  The Q2 2018 Form 10-Q stated that "[s]olid credit quality continued in second quarter 2018, as our net charge-off rate remained low at 0.26% (annualized) of average total loans."  The Q2 2018 Form 10-Q added that the Company held $36.4 billion in CLOs for sale and $75 million in CLOs held-to-maturity as of the end of the quarter.  The Q2 2018 Form 10-Q further touted the Company's credit quality, "driven by continued strong performance in the commercial and consumer real estate portfolios."  In particular, the Q2 2018 Form 10-Q stated:

**Credit Quality**

Solid overall credit results continued in second quarter 2018 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus.  Net

menu

charge-offs were $602 million, or 0.26% (annualized) of average loans, in second quarter 2018, compared with $655 million a year ago (0.27%).  The decrease in net charge-offs in second quarter 2018, compared with a year ago, was driven by lower losses in the commercial and industrial loan and other revolving credit and installment portfolios.

Our commercial portfolio net charge-offs were $67 million, or 5 basis points of average commercial loans, in second quarter 2018, compared with net charge-offs of $75 million, or 6 basis points, a year ago.  Net consumer credit losses decreased to 49 basis points (annualized) of average consumer loans in second quarter 2018 from 51 basis points (annualized) in second quarter 2017.  Approximately 81% of the consumer first mortgage loan portfolio outstanding at June 30, 2018, was originated after 2008, when more stringent underwriting standards were implemented.

The allowance for credit losses as of June 30, 2018, decreased $1.0 billion compared with a year ago and decreased $850 million from December 31, 2017.  We had a $150 million release in the allowance for credit losses in second quarter 2018, compared with a $100 million release a year ago.  The allowance coverage for total loans was 1.18% at June 30, 2018, compared with 1.27% a year ago and 1.25% at December 31, 2017.  The allowance covered 4.6 times annualized second quarter net charge-offs, compared with 4.6 times a year ago. Future allowance levels will be based on a variety of factors, including loan growth, portfolio performance and general economic conditions.  Our provision for loan losses  was $452 million in second  quarter  2018,  down  from $555 million a  year  ago, primarily reflecting an improvement in our outlook for 2017 hurricane-related losses, as well as continued improvement in residential real estate and lower loan balances.

Nonperforming assets decreased $305 million, or 4%, from March 31, 2018, the ninth consecutive quarter of decreases, with improvement in the real estate 1-4 family first mortgage portfolio and lower foreclosed assets.  Nonperforming assets were 0.85% of total loans, the lowest level since the merger with Wachovia in 2008.  Nonaccrual loans decreased $233 million from the prior quarter predominantly due to a decrease in real estate 1-4 family first mortgage nonaccruals.  In addition, foreclosed assets were down $72 million from the prior quarter.

164.     On October 12, 2018, Wells Fargo issued a press release announcing its third quarter 2018 financial results.  In its press release, the Company stated that, during the third quarter, it generated $6 billion in net income on $21.9 billion of revenue.  The Company added that period-end loan balances for commercial loans totaled $501.9 billion, and that Wells Fargo had just $152 million, or 0.12%, in net charge-offs in its commercial portfolio during the third quarter.  Defendant Shrewsberry commented in the press release, stating that Wells Fargo's "[c]redit performance and capital levels remained strong."

165.     That same day, the Company held an earnings conference call with analysts and investors to discuss the third quarter results.  During the call, defendant Shrewsberry stated, "[w]e continue to have strong credit quality."  He also highlighted a "$100 million reserve release reflecting strong credit

performance as well as lower loan balances."   Defendant Shrewsberry further touted the Company's allegedly continued "credit discipline in competitive and highly liquid financing" in the commercial real estate market.

166.   Also during the call, defendant Sloan emphasized Wells Fargo's customers' "high credit quality."  In particular, defendant Sloan stated:

> I think overall and what we're seeing is that the – because of the economic growth here in the U.S., in particular, but around the world, the credit quality for our customers in commercial corporate world has never been better.  The have – their balance sheets are strong.  They've extended their maturities.  Their interest coverage is higher than it's ever been because their debt service is lower.  So I think the fact that we've got very buoyant capital markets, very liquid capital markets and we have high credit quality for our customers means that loan growth is a little bit slower than we would have all imagined in an economic growth level that we're seeing right now.

> \*      \*      \*

> I think overall, what you see on our balance sheet today is not only really good credit performance but a much stronger mix in terms of credit quality even if we would go into some sort of an economic downturn[.]

167.   On November 6, 2018, Wells Fargo filed the Q3 2018 Form 10-Q with the SEC.  The Q3 2018 Form 10-Q contained signed certifications by defendants Sloan and Shrewsberry pursuant to SOX that "[t]he information contained in the [Q3 2018 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."  The Q3 2018 Form 10-Q stated that "[s]olid credit quality continued in third quarter 2018, as our net charge-off rate remained low at 0.29% (annualized) of average total loans."  The Q3 2018 Form 10-Q added that the Company held $36 billion in CLOs for sale and $75 million in CLOs held-to-maturity as of the end of the quarter.  The Q3 2018 Form 10-Q further touted the Company's credit quality, stating that "we continued to originate high quality loans, reflecting our long-term risk focus."  In particular, the Q3 2018 Form 10-Q stated:

**Credit Quality**

Solid overall credit results continued in third quarter 2018 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus.  Net charge-offs were $680 million, or 0.29% (annualized) of average loans, in third quarter 2018, compared with $717 million a year ago (0.30%).  The decrease in net charge-offs in third quarter 2018, compared with a year ago, was predominantly driven by lower losses in the automobile portfolio.

- 56 -

Our commercial portfolio net charge-offs were $152 million, or 12 basis points of average commercial loans, in third quarter 2018, compared with net charge-offs of $113 million, or 9 basis points, a year ago. Net consumer credit losses decreased to 47 basis points (annualized) of average consumer loans in third quarter 2018 from 53 basis points (annualized) in third quarter 2017. Approximately 83% of the consumer first mortgage loan portfolio outstanding at September 30, 2018, was originated after 2008, when more stringent underwriting standards were implemented.

The allowance for credit losses as of September 30, 2018, decreased $1.2 billion compared with a year ago and decreased $1.0 billion from December 31, 2017. We had a $100 million release in the allowance for credit losses in third quarter 2018, compared with no release a year ago. The allowance coverage for total loans was 1.16% at September 30, 2018, compared with 1.27% a year ago and 1.25% at December 31, 2017. The allowance covered 4.1 times annualized third quarter net charge-offs, compared with 4.3 times a year ago. Future allowance levels will be based on a variety of factors, including loan growth, portfolio performance and general economic conditions. Our provision for loan losses was $580 million in third quarter 2018, down from $717 million a year ago, reflecting an improvement in our outlook for 2017 hurricane-related losses, as well as continued improvement in residential real estate and lower loan balances.

Nonperforming assets decreased $410 million, or 5%, from June 30, 2018, the 10th consecutive quarter of decreases, with improvement in the consumer and commercial real estate portfolios. Nonperforming assets were 0.80% of total loans, the lowest level since the merger with Wachovia in 2008. Nonaccrual loans decreased $433 million from the prior quarter primarily due to a decrease in real estate 1-4 family first mortgage nonaccruals. Foreclosed assets were up $23 million from the prior quarter.

168.    On January 15, 2019, Wells Fargo issued a press release announcing its financial results for the fourth quarter and full year of 2018. In its press release, the Company stated that, during the fourth quarter, it generated $6.1 billion in net income on $21 billion of revenue. The Company added that period-end loan balances for commercial loans totaled $513.4 billion, and that Wells Fargo had just $132 million, or 0.10%, in net charge-offs in its commercial portfolio during the fourth quarter. Defendant Shrewsberry commented in the press release, stating that, "[c]ompared with the third quarter, we grew both loans and deposits and credit performance remained strong."

169.    That same day, Wells Fargo held an earnings conference call with analysts and investors to discuss the full year 2018 results. During the call, defendant Shrewsberry stated, "[w]e once again had strong credit quality and high levels of liquidity and capital." He also highlighted a "$200 million reserve release reflecting continued improvement in the credit quality of the loan portfolio." Defendant Shrewsberry further emphasized the growth in Wells Fargo's commercial loan portfolio, and in particular

the commercial and industrial ("C&I") loans, stating that these borrowers were "high quality."   In

particular, defendant Shrewsberry stated:

> Commercial loans grew $10 billion from a year ago and $11.5 billion from the third quarter.
> C&I loans have grown for 5 consecutive quarters and increased $12.2 billion from the third
> quarter.  This growth was broad-based across a number of our wholesale businesses and
> was largely to investment grade, corporate credits and high-quality middle-market
> borrowers.
>
> *       *       *
>
> We recognize that this credit cycle has lasted longer than most, so we remain vigilant
> regarding credit risk.  However, we continue to have strong credit results with a net charge-
> off rate of 30 basis points in the fourth quarter.  For the fifth consecutive quarter, all of our
> commercial and consumer real estate loan portfolios were in a net recovery position, and
> nonperforming assets declined $280 million or 4% from the third quarter, and were down
> 16% from a year ago.

170.    Defendant Shrewsberry added that the Company was "very cautious about how we select

customers," and that the structure of its loan originations presented "good risk return for Wells Fargo."  In

particular, he stated:

> One is we are a participant in financing some nonbanks.  This has been a topic of
> conversation on our calls before.  And so thinking about that, we did it before the last crisis,
> and we've done it since.  And we're very cautious about how we select customers, how we
> underwrite the credit that they're extending and the magnitude of the haircut that we require
> to protect our own advances.  So we were very familiar with what's going on.  We're also
> an investor, a CLO AAA investor, and were before the last crisis and have been today.
> And we think with the way loans are being originated, the way those deals are structured
> and our understanding and stressing of them, that, that's good risk return for Wells Fargo.
> With respect to the impact that it has on customers, we don't have, as customers, a lot of
> middle-market LBO candidates.  We do have sponsors as customers and other asset
> managers.  And as it relates to our core wholesale middle-market customer, they tend not
> to be a borrower of those other entities.  And so I think that our, as Tim said, our willingness
> to stand ready to lend directly to people with whom we have a relationship, that we
> understand when these other sources of liquidity go away, will be something that we're
> probably taking advantage of in the event that we hit the end of the cycle.  This was
> certainly true 10 years ago, and it might look similar this time.

171.    On February 27, 2019, Wells Fargo filed its Annual Report on Form 10-K with the SEC

for the period ended December 31, 2018 (the "2018 Form 10-K").  Defendants Sloan, Shrewsberry, Clark,

Craver, James, Morris, Hewett, Pujadas, Sargent, and Vautrinot each signed the 2018 Form 10-K.  The

2018 Form 10-K added that the Company held $35.6 billion in CLOs for sale and an additional $66 million

in CLOs held-to-maturity as of December 31, 2018.  The 2018 Form 10-K further touted the Company's credit quality, "driven by continued strong performance in the commercial and consumer real estate portfolios."  In particular, the 2018 Form 10-K stated:

**Credit Quality**

Credit quality remained solid in 2018, driven by continued strong performance in the commercial and consumer real estate portfolios.  Performance in several of our commercial and consumer loan portfolios remained near historically low loss levels and reflected our long-term risk focus.  Net charge-offs were $2.7 billion, or 0.29% of average loans, in 2018, compared with $2.9 billion, or 0.31%, in 2017.

Net losses in our commercial portfolio were $429 million, or 9 basis points of average commercial loans, in 2018, compared with $446 million, or 9 basis points, in 2017, driven by decreased losses in our commercial and industrial loan portfolio

* * *

The allowance for credit losses of $10.7 billion at December 31, 2018, declined $1.3 billion from the prior year.  Our provision for credit losses in 2018 was $1.7 billion, compared with $2.5 billion in 2017, reflecting a release of $1.0 billion in the allowance for credit losses, compared with a release of $400 million in 2017.  The release in 2018 and 2017 was due to strong underlying credit performance.

Nonperforming assets (NPAs) at the end of 2018 were $6.9 billion, down 16% from the end of 2017.  Nonaccrual loans declined $1.2 billion from the prior year end while foreclosed assets were down $191 million from 2017.

172.    On April 12, 2019, Wells Fargo issued a press release announcing its financial results for the first quarter of 2019.  In its press release, the Company stated that, during the first quarter, it generated $5.9 billion in net income on $21.6 billion of revenue.  The Company added that period-end loan balances for commercial loans totaled $512.2 billion, and that Wells Fargo had just $145 million, or 0.11%, in net charge-offs in its commercial portfolio during the first quarter.

173.    That same day, Wells Fargo held an earnings conference call with analysts and investors to discuss the first quarter results.  During the call, defendant Parker stated that "Wells Fargo has always excelled at management of credit and market risk."  Defendant Shrewsberry also highlighted Wells Fargo's commercial credit portfolio growth, stating:

Commercial loans declined $1.2 billion from the fourth quarter, driven by C&I loans.  Recall that we had strong C&I loan growth in the fourth quarter, which included benefits from the capital market disruption, and is expected some of those loans paid down when

capital markets rebounded.  This market improvement drove a $4 billion decline in Asset Backed Finance.  At the same time, we had strong growth in commercial capital, reflecting seasonal strength in Commercial Distribution Finance as well as capital finance, that growth driven by a customer's origination activity and working capital needs.  Our credit investment portfolio also increased as we purchased CLOs in loan form rather than as debt securities, which doesn't change the risk profile of the asset.

Commercial real estate loans increased $460 million from the fourth quarter, the first linked-quarter increase since the first quarter of 2017.  Our growth in the first quarter reflected our continued credit discipline and high-quality loan originations as well as less runoff of previously purchased loan portfolios.

174.    On May 3, 2019, Wells Fargo filed the Q1 2019 Form 10-Q with the SEC.  The Q1 2019 Form 10-Q contained signed certifications by defendants Parker and Shrewsberry pursuant to SOX that "[t]he information contained in the [Q1 2019 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."  The Q1 2019 Form 10-Q stated that "[s]olid credit quality continued in first quarter 2019, as our net charge-off rate remained low at 0.30% (annualized) of average total loans."  The Q1 2019 Form 10-Q added that the Company held $35.3 billion in CLOs for sale and $60 million in CLOs held-to-maturity as of the end of the quarter.  The Q1 2019 Form 10-Q further touted the Company's credit quality, stating that "we continued to originate high quality loans, reflecting our long-term risk focus."  In particular, the Q1 2019 Form 10-Q stated:

**Credit Quality**

Solid overall credit results continued in first quarter 2019 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus.  Net charge-offs were $695 million, or 0.30% (annualized) of average loans, in first quarter 2019, compared with $741 million a year ago (0.32%) (annualized).  The decrease in net charge-offs in first quarter 2019, compared with a year ago, was predominantly driven by lower losses in the automobile portfolio, partially offset by increases in the commercial and industrial portfolio and the credit card portfolio.

Our commercial portfolio net charge-offs were $145 million, or 11 basis points (annualized) of average commercial loans, in first quarter 2019, compared with net charge-offs of $78 million, or 6 basis points (annualized), a year ago.  Net consumer credit losses decreased to 51 basis points (annualized) of average consumer loans in first quarter 2019 from 60 basis points (annualized) in first quarter 2018.

The allowance for credit losses as of March 31, 2019, decreased $492 million compared with a year ago and increased $114 million from December 31, 2018.  We had a $150 million build in the allowance for credit losses in first quarter 2019, compared with a $550 million release a year ago.  The allowance coverage for total loans was 1.14% at March 31,

2019, compared with 1.19% a year ago and 1.12% at December 31, 2018.  The allowance covered 3.8 times annualized first quarter net charge-offs, compared with 3.8 times a year ago.  Future allowance levels will be based on a variety of factors, including loan growth, portfolio performance and general economic conditions.  Our provision for loan losses was $845 million in first quarter 2019, up from $191 million a year ago.  The increase was predominantly due to an allowance build in first quarter 2019 reflecting a higher probability of slightly less favorable economic conditions, compared with an allowance release for the same period last year, reflecting improvement in our outlook for 2017 hurricane–related losses.

Nonperforming assets increased $394 million, or 6%, from December 31, 2018 and represented 0.77% of total loans.  Nonaccrual loans increased $409 million from December 31, 2018, driven in part by a borrower in the utility sector, as well as increases in oil and gas.  Foreclosed assets declined $15 million from December 31, 2018.

175.    On July 16, 2019, Wells Fargo issued a press release announcing its financial results for the second quarter of 2019.  In its press release, the Company stated that, during the second quarter, it generated $6.2 billion in net income on $21.6 billion of revenue.  The Company added that period-end loan balances for commercial loans totaled $512.2 billion, and that Wells Fargo had just $165 million, or 0.13%, in net charge-offs in its commercial portfolio during the second quarter.  Defendant Shrewsberry commented in the press release, stating, "[o]ur credit quality remained solid with net charge-offs near historic lows."

176.    That same day, Wells Fargo held an earnings conference call with analysts and investors to discuss its second quarter of 2019 financial results.  During the call, defendant Shrewsberry stated, "[w]e had a $150 million reserve release, primarily driven by strong overall credit portfolio performance[.]"  He added, "I think our credit risks, our market risks, et cetera, have been historically very strong and continue to be today."  Defendant Shrewsberry further touted Wells Fargo's "continued credit discipline" in the commercial real estate portfolio, stating:

Commercial real estate loans increased $105 million from the first quarter, the second consecutive linked quarter increase, as growth in mortgage lending was partially offset by runoff of construction loans reflecting cyclicality of commercial real estate construction projects and our continued credit discipline.

177.    On August 2, 2019, Wells Fargo filed the Q2 2019 Form 10-Q with the SEC.  The Q2 2019 Form 10-Q contained signed certifications by defendants Parker and Shrewsberry pursuant to SOX that "[t]he information contained in the [Q2 2019 Form 10-Q] fairly presents, in all material respects, the

financial condition and results of operations of the Company."  The Q2 2019 Form 10-Q stated that "[s]olid credit quality continued in second quarter 2019, as our net charge-off rate remained low at 0.28% (annualized) of average total loans."  The Q2 2019 Form 10-Q added that the Company held $32.9 billion in CLOs for sale and $57 million in CLOs held-to-maturity as of the end of the quarter.  The Q2 2019 Form 10-Q further touted the Company's credit quality, stating that "we continued to originate high quality loans, reflecting our long-term risk focus."  In particular, the Q2 2019 Form 10-Q stated:

**Credit Quality**

Solid overall credit results continued in second quarter 2019 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus.  Net charge-offs were $653 million, or 0.28% (annualized) of average loans, in second quarter 2019, compared with $602 million a year ago (0.26%) (annualized).  The increase in net charge-offs in second quarter 2019, compared with a year ago, was predominantly driven by higher losses in the commercial and industrial portfolio and the credit card portfolio, partially offset by declines in the automobile portfolio.

Our commercial portfolio net charge-offs were $165 million, or 13 basis points (annualized) of average commercial loans, in second quarter 2019, compared with net charge-offs of $67 million, or 5 basis points (annualized), a year ago.  Net consumer credit losses decreased to 45 basis points (annualized) of average consumer loans in second quarter 2019 from 49 basis points (annualized) in second quarter 2018.

The allowance for credit losses as of June 30, 2019, decreased $507 million compared with a year ago and decreased $104 million from December 31, 2018.  We had a $150 million release in the allowance for credit losses in both second quarter 2019 and 2018.  The allowance coverage for total loans was 1.12% at June 30, 2019, compared with 1.18% a year ago and 1.12% at December 31, 2018.  The allowance covered 4.0 times annualized second quarter net charge-offs, compared with 4.6 times a year ago.  Future allowance levels will be based on a variety of factors, including loan growth, portfolio performance and general economic conditions.  Our provision for loan losses was $503 million in second quarter 2019, up from $452 million a year ago.

Nonperforming assets decreased $1.0 billion, or 14%, from March 31, 2019, and $648 million, or 9%, from December 31, 2018, and represented 0.66% of total loans at June 30, 2019.  Nonaccrual loans decreased $983 million from March 31, 2019, and $574 million from December 31, 2018, driven by a decline in consumer nonaccruals from the reclassification of $373 million in real estate 1-4 family first mortgage nonaccrual loans to mortgage loans held for sale (MLHFS) in second quarter 2019, as well as other broad-based improvement across several commercial industry categories.  Foreclosed assets decreased $59 million from March 31, 2019, and $74 million from December 31, 2018.

178.    On October 15, 2019, Wells Fargo issued a press release announcing its financial results for the third quarter of 2019.  In its press release, the Company stated that, during the third quarter, it generated $4.6 billion in net income on $22 billion of revenue.  The Company added that period-end loan balances for commercial loans totaled $512.3 billion, and that Wells Fargo had just $139 million, or 0.11%, in net charge-offs in its commercial portfolio during the third quarter.

179.    That same day, Wells Fargo held an earnings conference call with analysts and investors to discuss its third quarter of 2019 results.  During the call, defendant Shrewsberry touted the "continued credit discipline" in the commercial loan, CLO, and commercial real estate loan portfolios.  In particular, defendant Shrewsberry stated:

> Commercial loans were stable linked quarter as growth in C&I loans and lease financing was largely offset by declines in commercial real estate loans.  C&I loans were up $2 billion, with broad-based corp growth in corporate and investment banking and the purchase of CLOs in loan form in the credit investment portfolio.  These increases were partially offset by declines in commercial banking on lower government and institutional banking and middle-market lending and in commercial capital driven by seasonally lower commercial distribution finance dealer floor plan loans.

> Commercial real estate loans declined $2.2 billion from the second quarter with declines in both commercial real estate mortgage and commercial real estate construction loans, reflecting increasing market liquidity, higher refinancing activity and continued credit discipline.

> *       *       *

> We're generating growth in originations while maintaining our strong credit discipline with consistent loan-to-value, payment-to-income and FICO scores.

> *       *       *

> We closely monitor our commercial portfolio for signs of weakness, and credit quality indicators remain strong.  Our internal credit grades are at their strongest levels in 2 years. And since third quarter of 2017, our criticized loan balances have declined 20% with broad-based improvement across all commercial asset classes.

180.    Defendant Shrewsberry provided more detail about how Wells Fargo was purportedly exercising caution with its commercial real estate loan issuance, stating, "we really have to pick our spots in order to maintain our risk/reward, credit and pricing and loan terms quality."

181.     On November 1, 2019, Wells Fargo filed the Q3 2019 Form 10-Q with the SEC.  The Q3 2019 Form 10-Q contained signed certifications by defendants Scharf and Shrewsberry pursuant to SOX that "[t]he information contained in the [Q3 2019 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."  The Q3 2019 Form 10-Q stated that "[s]olid credit quality continued in third quarter 2019, as our net charge-off rate remained low at 0.27% (annualized) of average total loans."  The Q3 2019 Form 10-Q added that the Company held $30.9 billion in CLOs for sale and $49 million in CLOs held-to-maturity as of the end of the quarter.  The Q3 2019 Form 10-Q further touted the Company's credit quality, stating that "we continued to originate high quality loans, reflecting our long-term risk focus."  In particular, the Q3 2019 Form 10-Q stated:

**Credit Quality**

Solid overall credit results continued in third quarter 2019 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus. Net charge-offs were $645 million, or 0.27% (annualized) of average loans, in third quarter 2019, compared with $680 million a year ago (0.29%) (annualized). The decrease in net charge-offs in third quarter 2019, compared with a year ago, was predominantly driven by lower losses in the commercial real estate, automobile, and real estate 1-4 family junior lien mortgage portfolios, partially offset by increases in the real estate 1-4 family first mortgage and credit card portfolios.

Our commercial portfolio net charge-offs were $139 million, or 11 basis points (annualized) of average commercial loans, in third quarter 2019, compared with net charge-offs of $152 million, or 12 basis points (annualized), a year ago. Our consumer portfolio net charge-offs were $506 million, or 46 basis points (annualized) of average consumer loans, in third quarter 2019, compared with net charge-offs of $528 million, or 47 basis points (annualized), a year ago.

The allowance for credit losses as of September 30, 2019, decreased $343 million compared with a year ago and decreased $94 million from December 31, 2018. We had a $50 million build in the allowance for credit losses in third quarter 2019, compared with a $100 million release in the same period a year ago. The allowance coverage for total loans was 1.11% at September 30, 2019, compared with 1.16% a year ago and 1.12% at December 31, 2018. The allowance covered 4.1 times annualized net charge-offs in both third quarter 2019 and 2018. Future allowance levels will be based on a variety of factors, including loan growth, portfolio performance and general economic conditions. Our provision for loan losses was $695million in third quarter 2019, up from $580 million a year ago.

Nonperforming assets decreased $317 million, or 5%, from June 30, 2019, and $965 million, or 14%, from December 31, 2018, and represented 0.63% of total loans at September 30, 2019. Nonaccrual loans decreased $377 million from June 30, 2019, and

$951 million from December 31, 2018, driven by improvement across several commercial and consumer loan categories along with a decrease in consumer nonaccruals from sales of residential real estate mortgage loans as well as the reclassification of $10 million and $387 million in real estate 1-4 family mortgage nonaccrual loans to mortgage loans held for sale (MLHFS) in the third quarter and first nine months of 2019, respectively. Foreclosed assets increased $60 million from June 30, 2019, and decreased $14 million from December 31, 2018.

182.    On January 14, 2020, Wells Fargo issued a press release announcing its financial results for the fourth quarter and year of 2019.  In its press release, the Company stated that, during the fourth quarter, it generated $2.9 billion in net income on $19.9 billion of revenue.  The Company added that period-end loan balances for commercial loans totaled $515.7 billion, and that Wells Fargo had just $203 million, or 0.16%, in net charge-offs in its commercial credit portfolio during the fourth quarter.

183.    That same day, Wells Fargo held an earnings conference call with analysts and investors to discuss its fiscal 2019 financial results.  During the call, defendant Shrewsberry stated that "[w]e continue to have strong credit results with 32 basis points of net charge-offs in the fourth quarter."  He added, "[o]verall credit quality indicators in our commercial portfolio remain strong with our fourth quarter internal credit grades at their strongest levels in 2 years."  In response to one analyst's question concerning Wells Fargo's risk exposure, defendant Shrewsberry stated that "total CLO exposure is about $38 billion," which he reassured was "an asset class that we feel comfortable with the risk/reward[.]"

184.    On February 27, 2020, Wells Fargo filed its Annual Report on Form 10-K for the year ended December 31, 2019 (the "2019 Form 10-K").  Defendants Scharf, Shrewsberry, Clark, Craver, Hewett, James, Morris, Noski, Pujadas, Sargent, and Vautrinot each signed the 2019 Form 10-K.  The 2019 Form 10-K stated that "[s]olid credit quality continued in 2019, as our net charge-off rate remained low at 0.29% of average total loans."  The 2019 Form 10-K added that the Company held $29.7 billion in CLOs for sale as of December 31, 2019.  The 2018 Form 10-K further touted the Company's credit quality, stating that it "remained solid in 2019, as losses remained low and we continued to originate high-quality loans, reflecting our long-term risk focus."  In particular, the 2019 Form 10-K stated:

**Credit Quality**

Credit quality remained solid in 2019, as losses remained low and we continued to originate high-quality loans, reflecting our long-term risk focus.  Net charge-offs were $2.8 billion, or 0.29% of average loans, in 2019, flat compared with 2018.

Our commercial portfolio net charge-offs were $652 million, or 13 basis points of average commercial loans, in 2019, compared with $429 million, or 9 basis points, in 2018, predominantly driven by increased losses in our commercial and industrial loan portfolio.

\*       \*       \*

The allowance for credit losses of $10.5 billion at December 31, 2019, decreased $251 million from the prior year.  The allowance coverage for total loans was 1.09% at December 31, 2019, compared with 1.12% at December 31, 2018.  The allowance covered 3.8 times net charge-offs in 2019, compared with 3.9 in 2018. Future amounts of the allowance for credit losses will be based on a variety of factors, including loan growth, portfolio performance and general economic conditions.  Our provision for credit losses in 2019 was $2.7 billion, compared with $1.7 billion in 2018. The provision for credit losses in both 2019 and 2018 reflected continuing solid underlying credit performance.  The provision for credit losses in 2018 also reflected a higher level of credit quality improvement compared with 2019, as well as an improvement in the outlook associated with 2017 hurricane-related losses.

Nonperforming assets (NPAs) at December 31, 2019, were $5.6 billion, down $1.3 billion from December 31, 2018.  Nonaccrual loans decreased $1.2 billion from December 31, 2018, driven by improvement across all consumer loan categories, including a decrease in consumer nonaccruals from sales of residential real estate mortgage loans as well as the reclassification of real estate 1-4 family mortgage nonaccrual loans to mortgage loans held for sale (MLHFS) in 2019.  Foreclosed assets were down $148 million from December 31, 2018.

185.    The truth about the Company's defective commercial credit portfolio began to emerge on April 14, 2020, when Wells Fargo issued a press release announcing its financial results for the first quarter of 2020.  In its press release, the Company revealed that it was taking a massive ***$4 billion*** provision expense to account for expected credit delinquencies, which was up $3.2 billion from the first quarter of 2019.  The $4 billion provision expense included $940 million in net charge-offs on loans and debt securities, and a reserve build of $3.1 billion.  In particular, the press release stated:

- Credit quality:
  - Provision expense for loans and debt securities of $4.0 billion, up $3.2 billion from first quarter 2019
    - Net charge-offs on loans and debt securities of $940 million, up $245 million
      - Net loan charge-offs of 0.38% of average loans (annualized), up from 0.30%
    - Reserve build of $3.1 billion for loans and debt securities
  - Nonaccrual loans of $6.2 billion, down $749 million, or 11%

186.    That same day, Wells Fargo held an earnings conference call with analysts and investors to discuss its first quarter financial results.  During the question and answer session of the call, one analyst

- 66 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

asked about the "financials except banks" category in the Company's C&I portfolio, which was highlighted in an accompanying slide presentation.  In response, defendant Shrewsberry stated that this category, which consisted of 30% of total C&I loans outstanding, included loans to CLO credit managers and originators, who were expected to experience further "stress."  In particular, the following exchange took place:

> [Analyst:] And then if I can ask a second question, just in the -- on Slide 15, where you go through this C&I loans by bucket, can you talk a little bit about the financials except banks portfolio? I know you've discussed it in the past, but just given all the turmoil there has been in some of the non-bank areas, just maybe a little color and sort of what we should be thinking about that.

> [Defendant Shrewsberry:] Yeah. So the buckets of activity there, there is CLO-related activity, so credit managers, there is subscription finance, where we're providing leverage to alternative asset managers against the commitments of their limited partners to fund when called, there is leasing, there is auto, there is card, there is mortgage, there is commercial mortgage, etc. I'm sure we'll see a little bit more stress in the system. As it relates to the loan balances, they by and large tend to be the highest quality loan balances on a ratings basis -- or among the highest quality that we have because they're generally credit-enhanced pools of cross-collateralized receivables of one form or another and that's a huge benefit to us compared to the average portfolio of whole loans, where you have the first dollar of loss if something goes bad in a loan.

> Having said that, these types of customers will have stress often in their origination function, if they're an originator, or in their ongoing capital accumulation, if they're an asset manager. There can be stress on the side of this for those that are residential mortgage-oriented. Their life is going to be a servicing little bit harder presumably as servicing, servicing advances, default servicing and things like that pop up, and so we're managing them in that way.

187.    On this news, Wells Fargo's market capitalization plunged more than 3.98%, or $1.25 per share, on April 14, 2020, to close at $30.18 per share compared to the closing of $31.43 per share on April 13, 2020, erasing more than $5.1 billion in market capitalization in a single day.

188.    On May 5, 2020, Wells Fargo filed the Q1 2020 Form 10-Q with the SEC.  The Q1 2020 Form 10-Q revealed that the Company experienced a 9% decline in the fair value of its CLO investments held-for-sale since the end of fiscal 2019.  The Q1 2020 Form 10-Q added that, during the first quarter, the Company suffered $1.7 billion in unrealized losses on its CLO investments.

189.    On July 14, 2020, Wells Fargo issued a press release announcing its financial results for the second quarter of 2020.  In its press release, the Company disclosed that it suffered a $2.4 billion net

loss during the quarter.  In addition, the Company announced it was taking a ***$9.5 billion*** provision expense to account for expected credit delinquencies, which was more than double the amount from the first quarter of 2020.  The $9.5 billion provision expense included $1.1 billion in net charge-offs on loans and debt securities, and $8.4 billion in allowances for credit losses.  In particular, the press release stated:

- Financial results:
  - Net loss of $2.4 billion and diluted loss per share of $0.66
  - Revenue of $17.8 billion, down from $21.6 billion in second quarter 2019
    - Net interest income of $9.9 billion, down $2.2 billion
    - Noninterest income of $8.0 billion, down $1.5 billion
  - Noninterest expense of $14.6 billion, up $1.1 billion from second quarter 2019
    - Second quarter 2020 included:
      - Operating losses of $1.2 billion, primarily due to customer remediation accruals
      - Personnel, occupancy, and technology expense of $382 million related to the COVID-19 pandemic
  - Average loans of $971.3 billion, up $23.8 billion, or 3%, from second quarter 2019; period-end loans of $935.2 billion, down $74.7 billion, or 7%, from first quarter 2020
  - Average deposits of $1.4 trillion, up $117.7 billion, or 9%, from second quarter 2019; period-end deposits of $1.4 trillion, up $34.2 billion, or 2%, from first quarter 2020

- Credit quality:
  - Provision expense of $9.5 billion, up $9.0 billion from second quarter 2019
    - Net charge-offs of $1.1 billion, up $462 million
      - Net loan charge-offs of 0.46% of average loans (annualized), up from 0.28%
    - Increase in the allowance for credit losses of $8.4 billion
  - Nonaccrual loans of $7.6 billion, up $1.7 billion, or 28%

190.    On August 4, 2020, Wells Fargo filed its Quarterly Report on Form 10-Q for the period ended June 30, 2020 (the "Q2 2020 Form 10-Q") with the SEC.  The Q2 2020 Form 10-Q revealed that the fair value of Wells Fargo's CLO investments held-for-sale further declined to $25.7 billion during the quarter.  The Q2 2020 Form 10-Q added that, during the second quarter, the Company suffered $729 million in unrealized losses on its CLO investments.

191.    Finally, on October 14, 2020, Wells Fargo issued a press release announcing its financial results for the third quarter of 2020.  In its press release, the Company disclosed that it recognized another provision expense of $769 million, and that nonaccrual loans had increased 45%, or $2.5 billion, to $8 billion during the third quarter.

192.    On this news, Wells Fargo's market capitalization plunged more than 6%, or $1.49 per share, on October 14, 2020, to close at $23.25 per share compared to the closing of $24.74 per share on October 13, 2020, erasing more than $6.1 billion in market capitalization in a single day.

193.    Further, as a direct result of this unlawful course of conduct, Wells Fargo is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Northern District of California on behalf of investors who purchased Wells Fargo shares.

## DAMAGES TO WELLS FARGO

194.    The Individual Defendants' participation in the wrongdoing detailed above and failure to remedy the Company's improper business practices has exposed Wells Fargo to billions of dollars in liability for individual and class action lawsuits.

195.    As a result of the Individual Defendants' improprieties, Wells Fargo disseminated improper, public statements concerning its business, operations, and risk and compliance policies.  These improper statements have devastated Wells Fargo's credibility as reflected by the Company's more than $237 billion, or 73%, market capitalization loss to date.

196.    Wells Fargo's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Wells Fargo's current and potential customers consider a company's ability to fully comply with laws, rules, and regulations designed to address and decrease fraudulent consumer practices.  Businesses are less likely to award contracts to companies that have problems complying with the law or have repeatedly and consistently caused irreparable harm to its own customers.  Wells Fargo's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

197.    Further, as a direct and proximate result of the Individual Defendants' actions, Wells Fargo has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)     costs incurred from defending and paying any settlement in the class actions for violations of state laws against unfair business practices, fraudulent concealment, and false advertising;

(c)     costs incurred in complying with the governmental investigations into the misconduct detailed herein, including any fines or penalties resulting therefrom; and

(d)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Wells Fargo.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

198.     Plaintiff brings this action derivatively in the right and for the benefit of Wells Fargo to redress injuries suffered, and to be suffered, by Wells Fargo as a direct result of violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Wells Fargo is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

199.     Plaintiff will adequately and fairly represent the interests of Wells Fargo in enforcing and prosecuting its rights.

200.     Plaintiff has continuously been a stockholder of Wells Fargo since August 2014.

201.     The current Board of Wells Fargo consists of the following thirteen individuals: defendants Scharf, Clark, Craver, Hewett, James, Morris, Noski, Payne, Pujadas, Sargent, Vautrinot, and nondefendants Steven D. Black ("Black") and Mark A. Chancy ("Chancy").  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct**

202.     As alleged above, defendants Scharf, Clark, Craver, Hewett, James, Morris, Noski, Payne, Pujadas, Sargent, and Vautrinot breached their fiduciary duties of loyalty by abdicating their responsibility to exercise proper oversight of Wells Fargo.  These defendants had discrete duties to submit plans to the FRS, CFPB, and OCC to enhance the Board's governance and oversight of the Company, and improve the Company's compliance and operational risk management program.  Notably, defendants Clark, Craver,

James, Morris, Sargent, and Vautrinot signed the FRS Consent Order on February 2, 2018.  As described herein, the FRS Consent Order and the CFPB and OCC Consent Orders required the Board to oversee, review, and maintain policies and procedures designed to fix Wells Fargo's abusive culture.  Despite their knowledge of the regulatory directives, defendants Scharf, Clark, Craver, Hewett, James, Morris, Noski, Payne, Pujadas, Sargent, and Vautrinot chose to carry on with business as usual.  These defendants knew of the duties imposed on them but failed to act, and as a result, the Company has failed to implement adequate remedial measures and risk and compliance management programs to protect against current and future consumer abuses.

203.    Furthermore, defendants Scharf, Clark, Craver, Hewett, James, Morris, Noski, Payne, Pujadas, Sargent, and Vautrinot breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding Wells Fargo's progress and compliance with the regulatory consent orders described herein.  Defendants Scharf, Clark, Craver, Hewett, James, Morris, Noski, Payne, Pujadas, Sargent, and Vautrinot also made improper statements in the Company's press releases and SEC filings regarding the credit quality of Wells Fargo's commercial credit portfolios, and the quality of its related underwriting and due diligence policies and procedures.  Thus, defendants Scharf, Clark, Craver, Hewett, James, Morris, Noski, Payne, Pujadas, Sargent, and Vautrinot face a substantial likelihood of liability for their breach of fiduciary duties.  Any demand upon them is futile.

204.    In addition, defendants Craver, Noski, and Sargent, as members of the Audit Committee, reviewed and approved the improper statements described herein.  Thus, defendants Craver, Noski, and Sargent were responsible for knowingly or recklessly allowing the improper statements related to the Company's regulatory compliance and disclosure controls.  Despite their knowledge or reckless disregard, defendants Craver, Noski, and Sargent caused the improper statements in the Company's press releases and public filings.  Accordingly, the defendants Craver, Noski, and Sargent breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, defendants Craver, Noski, and Sargent face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

205.    Defendants Clark, Craver, James, Morris, Pujadas, Sargent, and Vautrinot are responsible for the negligently made statements in the materially misleading 2018 Proxy.  It is against public policy

to indemnify individuals for violations of section 14(a) of the Exchange Act. An indemnification provided by the Company to defendants Clark, Craver, James, Morris, Pujadas, Sargent, and Vautrinot does not protect them for violations of section 14(a) in the 2018 Proxy. Accordingly, defendants Clark, Craver, James, Morris, Pujadas, Sargent, and Vautrinot face a substantial likelihood of liability, excusing demand.

206.    The principal professional occupation of defendant Scharf is his employment with Wells Fargo, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendant Scharf lacks independence from defendants Clark, Craver, Hewett, James, Morris, Noski, Payne, Pujadas, Sargent, Vautrinot, and nondefendants Black and Chancy due to his interest in maintaining his executive position at Wells Fargo. This lack of independence renders defendant Scharf incapable of impartially considering a demand to commence and vigorously prosecute this action. Wells Fargo paid defendant Scharf the following compensation:

| Year | Salary | Bonus | Stock Awards | Total |
|------|--------|-------|--------------|-------|
| 2019 | $498,084 | $5,000,000 | $28,788,490 | $34,286,574 |

Accordingly, defendant Scharf is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Scharf.

207.    Plaintiff has not made any demand on the other stockholders of Wells Fargo to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Wells Fargo is a publicly held company with over 4.1 billion shares outstanding and thousands of stockholders as of October 23, 2020;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against Defendants Clark, Craver, James, Morris, Pujadas, Sargent, Sloan, and Vautrinot
for Violation of Section 14(a) of the Exchange Act**

208.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except for those allegations concerning fraud.

209.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any reckless or knowing conduct by or on behalf of defendants Clark, Craver, James, Morris, Pujadas, Sargent, Sloan, and Vautrinot.  The section 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

210.     Defendants Clark, Craver, James, Morris, Pujadas, Sargent, Sloan, and Vautrinot negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were contained in the 2018 Proxy.  The 2018 Proxy contained a proposal to the Company's stockholders that they vote to reelect the members of the Board.  The 2018 Proxy also contained two stockholder proposals demanding the Company to engage independent experts or resources to reform its executive compensation policy with social responsibility and demanding that the Board prepare a report on the Company's employee incentive compensation and the risk of material losses.  The 2018 Proxy, however, misrepresented and failed to disclose and explain that: (i) the Company was not compliant with the FRS Consent Order nor the CFPB and OCC Consent Orders; (ii) the Company's remediation plans were inadequate, incomplete, and insufficient to prevent future consumer abuses; (iii) the Company's remedial measures and risk and compliance management were inadequate to protect against consumer fraud; (iv) the Company lacked adequate disclosure controls and procedures and internal controls over financial reporting; and (v) as a result of the foregoing, the Individual Defendants' representations concerning the Company's business, operations, and financial prospects were improper when made.

211.     By reasons of the conduct alleged herein, defendants Clark, Craver, James, Morris, Pujadas, Sargent, Sloan, and Vautrinot violated section 14(a) of the Exchange Act.  As a direct and

proximate result of these violations, stockholder voted in favor of reelecting defendants Clark, Craver, James, Morris, Pujadas, Sargent, Sloan, and Vautrinot to the Board.  Defendants Clark, Craver, James, Morris, Pujadas, Sargent, Sloan, and Vautrinot led to the continuation of the wrongful actions described herein.  In addition, as a direct and proximate results of these violations, Wells Fargo's stockholders voted against the stockholder proposals to reform the Company's executive compensation policy with social responsibility and require the Board to prepare a report on incentive compensation and risks of material losses.

212.    Plaintiff, on behalf of Wells Fargo, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants Clark, Craver, James, Morris, Pujadas, Sargent, Sloan, and Vautrinot, as well as the improper executive and employee incentive payouts, based upon the false and misleading 2018 Proxy, and also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures.

## **COUNT II**

### **Against the Individual Defendants for Breach of Fiduciary Duty**

213.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

214.    The Individual Defendants owed and owe Wells Fargo fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Wells Fargo the highest obligation of loyalty and care.

215.    The Individual Defendants and each of them, violated and breached their fiduciary duties.

216.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that the Company repeatedly submitted insufficient remediation plans to regulators, struggled to meet regulator deadlines, and failed to implement meaningful reforms.  In addition, the Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that the Company unfairly allocated customers' PPP loan applications and concealed these practices from the public.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

217.     The Director Defendants, as directors of the Company, owed Wells Fargo the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning the Company's complete failures to comply with the regulatory consent orders.  The Director Defendants knew or were reckless in not knowing that that the Company repeatedly submitted insufficient remediation plans to regulators, struggled to meet regulator deadlines, and failed to implement meaningful reforms.  In addition, the Director Defendants either knew, were reckless, or were grossly negligent in not knowing that the Company unfairly allocated customers' PPP loan applications and concealed these practices from the public.  Accordingly, these defendants breached their duty of loyalty to the Company.

218.     The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

219.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Wells Fargo has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

220.     Plaintiff, on behalf of Wells Fargo, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

221.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

222.     As a result of the Individual Defendants' failure to properly supervise and monitor the adequacy of the Company's internal controls and its compliance with the law, the Individual Defendants have caused Wells Fargo to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

223.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

224.     Plaintiff, on behalf of Wells Fargo, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

225.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

226.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Wells Fargo.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Wells Fargo.

227.    Plaintiff, as a stockholder and representative of Wells Fargo, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

228.    Plaintiff, on behalf of Wells Fargo, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Wells Fargo, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Wells Fargo to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Wells Fargo and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Board's oversight of risk management and internal controls over regulatory compliance and the Company's commercial lending practices;

2.    a proposal to strengthen the Company's controls over financial reporting;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

4.      a provision to permit the stockholders of Wells Fargo to nominate at least three candidates for election to the Board.

C.      Extraordinary equitable or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Wells Fargo has an effective remedy;

D.      Awarding to Wells Fargo restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: December 10, 2020

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS

/s/*Brian J. Robbins*
BRIAN J. ROBBINS

5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
       csmith@robbinsllp.com
       ssanders@robbinsllp.com

Attorneys for Plaintiff

1470170

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

I, Timothy Himstreet, hereby declare as follows:

I am a stockholder of Wells Fargo & Company and have been a stockholder continuously since August 2014.  I have retained competent counsel and am ready, willing, and able to pursue this action vigorously on behalf of Wells Fargo & Company.  I have reviewed the verified stockholder derivative complaint.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_____
12/9/2020

DocuSigned by:

_Timothy M. Himstreet_
3138C8E157B0435...

_____   _____
TIMOTHY HIMSTREET