Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, CA 94303
Telephone: (650) 461-5600
Facsimile: (650) 461-5700

Christopher M. Viapiano (*pro hac vice*)
(viapianoc@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 293-6330

Richard C. Pepperman II (*pro hac vice*)
(peppermanr@sullcrom.com)
Leonid Traps (*pro hac vice*)
(trapsl@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel for Nominal Defendant
Wells Fargo & Company*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY STOCKHOLDER DERIVATIVE LITIGATION | Lead Case No. 3:20-cv-08750-MMC |
| This Document Relates To: | **WELLS FARGO & COMPANY'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT FOR FAILURE ADEQUATELY TO PLEAD DEMAND FUTILITY** |
| ALL ACTIONS | |
| | Hearing:  October 15, 2021 Time:  9:00 a.m. The Honorable Maxine M. Chesney |

# TABLE OF CONTENTS

<b><u>Page</u></b>

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT ...............................................................................................................2

I.      Plaintiffs Fail To Plead That a Majority of the Directors Face a Substantial Likelihood of Personal Liability Because They Consciously Failed To Oversee Wells Fargo's Efforts To Comply with the Consent Orders. ...........................................................2

      A.      Plaintiffs Misstate the Governing Pleading Standards under Delaware Law. ....................2

      B.      Unable To Point to any Particularized Factual Allegations as to a Majority of the Board, Plaintiffs Rely on Conjecture and Conclusory Allegations. ...................................3

      C.      The Complaint's Allegations Fall Short of Pleading the Extraordinary Conduct at Issue in the Few Cases That Have Excuse Demand under Delaware Law........................7

      D.      Plaintiffs Cannot Plead Demand Futility by Citing the Risk Committee's Charter. ..........9

II.     Plaintiffs Fail To Plead a Single False or Misleading Statement, Much Less That Any Individual Director Deliberately Made Such a Statement or Allowed One To Be Made. ...........10

III.    Plaintiffs Fail Meaningfully To Address Defendants' Arguments That the Directors Do Not Face a Substantial Likelihood of Personal Liability on Plaintiffs' Section 14(a) Claim........12

IV.     Plaintiffs Fail To Plead That Wells Fargo CEO Charles Scharf Lacks Independence..................14

CONCLUSION.................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbott Labs. Derivative S'holders Litig.*,
  325 F.3d 795 (7th Cir. 2003) ........................................................................8

*Arnold* v. *Soc'y for Sav. Bancorp., Inc.*,
  650 A.2d 1270 (Del. 1994) ...........................................................................3

*Baker, Watts & Co.* v. *Miles & Stockbridge*,
  876 F.2d 1101 (4th Cir. 1989) ....................................................................13

*Brown* v. *Brewer*,
  2010 WL 2472182 (C.D. Cal. June 17, 2010) ...............................................3

*CHC Invs., LLC* v. *FirstSun Cap. Bancorp*,
  2019 WL 328414 (Del. Ch. Jan. 24, 2019) ...................................................4

*Cho* v. *UCBH Holdings*,
  2011 WL 3809903 (N.D. Cal. May 17, 2011) ..............................................11

*In re Citigroup Inc. S'holder Derivative Litig.*,
  964 A.2d 106 (Del. Ch. 2009) ..........................................................1, 2, 10, 11

*City of Birmingham Ret. & Relief Sys.* v. *Good*,
  177 A.3d 47 (Del. 2017) ................................................................................3

*City of Detroit Police & Fire Ret. Sys.* v. *Hamrock*,
  2021 WL 877720 (D. Del. Mar. 9, 2021) ....................................................13

*Cohen* v. *Viray*,
  622 F.3d 188 (2d Cir. 2010) .........................................................................13

*In re Cornerstone Therapeutics Inc. S'holder Litig.*,
  115 A.3d 1173 (Del. 2015) .............................................................................3

*Credit Suisse First Boston, LLC* v. *Intershop Commc'ns AG*,
  407 F. Supp. 2d 541 (S.D.N.Y. 2006) ...................................................10, 13

*In re Crimson Exploration Inc. S'holder Litig.*,
  2014 WL 5449419 (Del. Ch. Oct. 24, 2014) ..............................................3, 7

*Desimone* v. *Barrows*,
  924 A.2d 908 (Del. Ch. 2007) .......................................................................4

*In re Diamond Foods, Inc.*,
  2012 WL 1945814 (N.D. Cal. May 29, 2012) ..............................................13

-ii-

Sullivan & Cromwell LLP

*Emps. Ret. Sys. of City of St. Louis* v. *Jones*,
  2021 WL 1890490 (S.D. Ohio May 11, 2021) ....................................................................14

*In re Facebook, Inc. Sec. Litig.*,
  405 F. Supp. 3d 809 (N.D. Cal. 2019) ...............................................................................12

*In re Fossil, Inc*,
  713 F. Supp. 2d 644 (N.D. Tex. 2010) ...............................................................................14

*In re Goldman Sachs Grp., Inc. S'holder Litig.*,
  2011 WL 4826104 (Oct. 12, 2011) .......................................................................................1

*Gulbrandsen* v. *Stumpf*,
  2013 WL 1942158 (N.D. Cal. May 9, 2013) .........................................................................8

*Henry* v. *Tyler*,
  2020 WL 3574637 (N.D. Cal. July 1, 2020) .........................................................................5

*Horman* v. *Abney*,
  2017 WL 242571 (Del. Ch. Jan. 19, 2017) ...........................................................................2

*Hughes* v. *Xioaming Hu*,
  2020 WL 1987029 (Del. Ch. Apr. 27, 2020) .......................................................................12

*In re infoUSA, Inc. S'holders Litig.*,
  953 A.2d 963 (Del. Ch. 2007) ............................................................................................11

*In re Intuitive Surgical S'holder Derivative Litig.*,
  146 F. Supp. 3d 1106 (N.D. Cal. 2015) ................................................................................9

*Lipton* v. *Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) ..............................................................................................6

*In re Massey Energy Co.*,
  2011 WL 2176479 (Del. Ch. May 31, 2011) ......................................................................7, 8

*McCall* v. *Scott*,
  239 F.3d 808 (6th Cir. 2001) ................................................................................................9

*Melbourne Mun. Firefighters' Pension Tr. Fund* v. *Jacobs*,
  2016 WL 4076369 (Del. Ch. Aug. 1, 2016) ..........................................................................8

*Okla. Firefighters Pension & Ret. Sys.* v. *Corbat*,
  2017 WL 6452240 (Del. Ch. Dec. 18, 2017) ...........................................................1, 5, 6, 8

*In re PayPal Holdings, Inc. S'holder Derivative Litig.*,
  2018 WL 466527 (N.D. Cal. Jan. 18, 2018) .......................................................................14

*In re Pfizer Inc. S'holder Derivative Litig.*,
  722 F. Supp. 2d 453 (S.D.N.Y. 2010) ...............................................................................8, 9

*Pickett* v. *Gorevic*,
  2021 U.S. Dist. LEXIS 63135 (S.D.N.Y. Mar. 26, 2021) ................................................13

*Reiter* v. *Fairbank*,
  2016 WL 6081823 (Del. Ch. Oct. 18, 2016) ..................................................................8

*Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc.*,
  506 A.2d 173 (Del. 1986) ..................................................................................................4

*Rosenbloom* v. *Pyott*,
  765 F.3d 1137 (9th Cir. 2014) ..........................................................................................5

*Rosky* v. *Farha*,
  2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) ...............................................................9

*Ryan* v. *Gifford*,
  918 A.2d 341 (Del. Ch. 2007).........................................................................3, 10, 11, 12

*Sandys* v. *Pincus*,
  152 A.3d 124 (Del. 2016) ................................................................................................15

*In re SCANA Corp. Derivative Litig.*,
  2018 WL 3141813 (D.S.C. June 27, 2018).......................................................................9

*Smith* v. *Carrillo*,
  2019 WL 6328033 (D. Del. Nov. 26, 2019) ...................................................................14

*South* v. *Baker*,
  62 A.3d 1 (Del. Ch. 2012)....................................................................................... *passim*

*Stone* v. *Ritter*,
  911 A.2d 362 (Del. 2006) ..................................................................................................3

*Towers* v. *Iger*,
  912 F.3d 523 (9th Cir. 2018) ............................................................................................6

*In re Veeco Instruments, Inc. Sec. Litig.*,
  434 F. Supp. 2d 267 (S.D.N.Y. 2008)...............................................................................9

*In re Verisign, Inc., Derivative Litig.*,
  531 F. Supp. 2d 1173 (N.D. Cal. 2007) ..........................................................................15

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
  282 F. Supp. 3d 1074 (N.D. Cal. 2017) ..........................................................................14

*Westmoreland Cnty. Emp. Ret. Sys.* v. *Parkinson*,
  727 F.3d 719 (7th Cir. 2013) ............................................................................................8

*In re Zimmer Biomet Holdings, Inc. Derivative Litig.*,
  2021 WL 3779155 (Del. Ch. Aug. 25, 2021) ...........................................................10, 11

*Zoumboulakis* v. *McGinn*,
  2014 WL 3926565 (N.D. Cal. Aug. 7, 2014) ..........................................................................12

**Statutes, Rules, and Regulations**

Federal Rule of Civil Procedure 23.1 .................................................................................................9

12 C.F.R. § 261.2(b)(1)........................................................................................................................10

Delaware General Corporation Law Section 102(b)(7)................................................................3, 13

-v-

SULLIVAN &
CROMWELL LLP

**PRELIMINARY STATEMENT**

Plaintiffs cannot dispute that the pleading standard to usurp the Board's decision-making authority and bring claims on Wells Fargo's behalf is stringent: they must plead particularized facts, on a director-by-director basis, demonstrating that a majority of Wells Fargo's Board—seven of Wells Fargo's 13 Directors as of the time the complaints were filed—lacks independence or faces a substantial likelihood of personal liability on the claims asserted. Faced with that high pleading burden, Plaintiffs abandon two of the three bases for their Complaint's allegation of demand futility: their claims based on Wells Fargo's (i) participation in the Paycheck Protection Program ("PPP") and (ii) commercial lending practices. (Opp'n 1 n.2.) As a result, their claim of demand futility is now limited to Wells Fargo's compliance with three regulatory Consent Orders issued in 2018, but that theory fares no better. Plaintiffs do not even attempt to argue that they have pled particularized factual allegations showing that a majority of the Board failed to oversee, or allowed false or misleading statements to be made about, Wells Fargo's compliance with the Consent Orders. Barely referring to the Complaint at all, Plaintiffs' Opposition instead cites portions of the House Financial Services Committee ("HFSC") reports that discuss the conduct of *former* Wells Fargo officers and directors, which is irrelevant to demand futility.

At bottom, Plaintiffs ask this Court to *presume* bad-faith conduct by a majority of the current Board because Wells Fargo to date has failed to address all of the Consent Orders' requirements. Delaware law, however, does not permit such a presumption because "[b]ad results alone do not imply bad faith." *Okla. Firefighters Pension & Ret. Sys.* v. *Corbat*, 2017 WL 6452240, at *3 (Del. Ch. Dec. 18, 2017). To plead that individual directors face a substantial likelihood of personal liability based on a *Caremark* failure-of-oversight claim, Plaintiffs must allege particularized facts showing an "'intentional dereliction of duty' or 'a conscious disregard' for [a director's] responsibilities, amounting to bad faith." *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *13 (Oct. 12, 2011). That is why such a claim is "the most difficult theory in corporation law" on which to prevail. *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009). No such facts are alleged anywhere in the Complaint (or found even in the HFSC reports) concerning Wells Fargo's current directors, the majority of whom were elected in 2018, 2019, and 2020 with the mandate of helping Wells Fargo address its regulatory issues. The Complaint also is devoid of particularized facts

1  demonstrating that a majority of the directors "*deliberately* misinform[ed] shareholders" about

2  compliance with the Consent Orders. *Id*. at 132.

3       Plaintiffs' remaining attempts to plead demand futility are likewise deficient.  Plaintiffs never

4  meaningfully address the multiple fatal defects with their Section 14(a) claim, including that the 2018

5  Proxy could not have misrepresented the status of Wells Fargo's compliance with the Consent Orders.

6  When that Proxy was issued, the OCC and CFPB Consent Orders did not even exist, and Wells Fargo

7  had not yet submitted its remediation plan under the FRB Consent Order, much less received feedback

8  from the FRB about its compliance.  (Mot. 17.)  Nor do Plaintiffs distinguish the many cases holding

9  that exculpatory clauses like the one in Wells Fargo's charter bar Section 14(a) claims of the sort alleged

10  here.  Finally, in arguing that a single director, Charles Scharf, lacks independence, Plaintiffs repeat their

11  same conclusory assertion, without citing any well-pled facts.  Plaintiffs do not contend that any other

12  director lacks independence.

13       In sum, Plaintiffs fail to show that the Complaint pleads particularized facts demonstrating that a

14  majority of Wells Fargo's Board lacks independence or faces a substantial likelihood of personal

15  liability.  As a result, the Complaint should be dismissed for failure to plead demand futility.

16                                **ARGUMENT**

17  **I.    Plaintiffs Fail To Plead That a Majority of the Directors Face a Substantial Likelihood of
       Personal Liability Because They Consciously Failed To Oversee Wells Fargo's Efforts To
18       Comply with the Consent Orders.**

19       Plaintiffs devote most of their Opposition to arguing that a majority of the Board faces a

20  substantial likelihood of liability for failing to oversee the Company's compliance with the Consent

21  Orders.  Notwithstanding Plaintiffs' efforts to water down the relevant pleading standard and dress up

22  their conclusory allegations, the Complaint does not contain the necessary particularized allegations.

23       **A.    Plaintiffs Misstate the Governing Pleading Standards under Delaware Law.**

24       Although they conspicuously avoid saying so in their Opposition, Plaintiffs' claims against

25  Wells Fargo's directors for "consciously disregarding [their] responsibility for overseeing the

26  Company's compliance with the Consent Orders and ensuring Wells Fargo implemented appropriate

27  risk and compliance programs" (Opp'n 9) are *Caremark* claims under Delaware law.  *See Horman* v.

28  *Abney*, 2017 WL 242571, at *1 (Del. Ch. Jan. 19, 2017) (claim for "breach of fiduciary duty arising

-2-

from a failure of oversight [is] well known in Delaware corporate law as a *Caremark* claim"). Such claims come with a very heavy pleading burden. *See*, *e.g.*, *South* v. *Baker*, 62 A.3d 1, 25 (Del. Ch. 2012) ("*Caremark* claims are difficult to plead and harder to prove."). Plaintiffs cannot escape that heavy pleading burden by pretending that it does not exist.

To the extent that they acknowledge the pleading standard, Plaintiffs water it down. Although they agree that they must plead "particularized allegations" demonstrating that the directors deliberately acted in "bad faith" (Opp'n 8-10), Plaintiffs suggest that a mere "fail[ure] to take action to protect corporate interests" is sufficient to establish bad-faith conduct (*id.* at 9; *see also id.* at 11 ("allegations that directors failed to take reasonable steps to remediate known compliance issues are sufficient to establish bad faith conduct")). That is incorrect. To state a *Caremark* claim, Plaintiffs must plead "with particularity that the directors . . . 'had actual or constructive knowledge that their conduct was legally improper.'" *City of Birmingham Ret. & Relief Sys.* v. *Good*, 177 A.3d 47, 55 (Del. 2017).[1] Alleging that mistakes occurred on the Board's watch is insufficient. *See Stone* v. *Ritter*, 911 A.2d 362, 373 (Del. 2006) (derivative plaintiffs cannot "equate a bad outcome with bad faith").[2]

## B. Unable To Point to any Particularized Factual Allegations as to a Majority of the Board, Plaintiffs Rely on Conjecture and Conclusory Allegations.

Plaintiffs water down the pleading standard because they cannot satisfy it. A "derivative

---

[1] Plaintiffs cite multiple non-*Caremark* cases (Opp'n 9), but even these cases make clear that *intentional* wrongdoing is required to plead bad faith. *E.g.*, *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *23 (Del. Ch. Oct. 24, 2014) ("Allegations that directors failed to do all they should have state merely a violation of the duty of care."); *Brown* v. *Brewer*, 2010 WL 2472182, at *4 (C.D. Cal. June 17, 2010) (bad faith requires an "intentional dereliction of duty or a conscious disregard for one's responsibilities"); *Ryan* v. *Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007) (bad faith "may be shown where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation" or "intentionally fails to act in the face of [a] known duty to act").

[2] Plaintiffs state that Wells Fargo's exculpatory provision "does not shield Defendants from liability for violating their fiduciary duty of loyalty." (Opp'n 9 n.7.) But that is precisely the point. Plaintiffs must satisfy the *higher* pleading standard for a breach of the duty of loyalty; gross negligence or a breach of the duty of care will not suffice. Plaintiffs also contend that application of the exculpatory provision is "improper on a motion to dismiss." (*Id.*) That is contrary to well-established law. *See In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1175 (Del. 2015) (plaintiff "must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss"). Plaintiffs' assertion that the exculpation provision applies only to non-executive directors also lacks support. Section 102(b)(7) applies to a director who also is an officer except for "specific actions [he or she] undertook as an officer (as distinct from actions as a director)." *Arnold* v. *Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1288 (Del. 1994). Plaintiffs make no effort to draw that distinction as to Charles Scharf, the sole director who also is an officer (CEO) of Wells Fargo.

-3-

1    complaint must plead facts *specific to each director*, demonstrating that at least half of them could not

2    have exercised disinterested business judgment in responding to a demand." *Desimone* v. *Barrows*, 924

3    A.2d 908, 943 (Del. Ch. 2007).  When confronted with those pleading requirements, Plaintiffs cannot

4    point to any particularized allegations in the Complaint demonstrating that *any* particular director acted

5    in bad faith, let alone that a majority of the Board did.  In fact, Plaintiffs' Opposition barely cites the

6    Complaint.  Instead, over the course of the seven pages purporting to outline their *Caremark* claim

7    (Opp'n 9-15), Plaintiffs cite their 308-paragraph Complaint only *twice*:  to describe the Consent Orders'

8    general requirements (Compl. ¶¶ 60-62) and to describe generally the HFSC majority's report (*id.*

9    ¶¶ 218-21).  (Opp'n 10, 13.)  None of those cited paragraphs describes specific conduct or intent on the

10   part of any of the current directors.[3]

Faced with the Complaint's deficiencies, Plaintiffs turn to the HFSC reports.  As Defendants

12   explained (Mot. 12), however, the HFSC reports, like the Complaint, barely mention Wells Fargo's

13   current directors.  The portions that Plaintiffs cite include specific accusations only about the knowledge

14   of and conduct by *former* CEO Tim Sloan and *former* directors Betsy Duke, Karen Peetz, and James

15   Quigley.  (*See, e.g.*, Opp'n 10 (citing majority report pages 47-55, which describe the motivations of and

16   statements by certain "key leaders" such as Duke, Peetz, Quigley, and Sloan, and pages 64-65, which

17   describe conversations between Duke and regulators).)  Conspicuously lacking from the HFSC reports

18   are particularized facts concerning the alleged motivations or knowledge of any *current* director, the

19   sole focus of the demand-futility inquiry.

With no particularized allegations as to the current Board, Plaintiffs contend that Wells Fargo's

21   directors face a substantial likelihood of personal liability because the Board has "'ultimate

22   responsibility' for the Company's compliance with the Consent Orders."  (Opp'n 10.)   But that

23   contention proves too much because the board is *always* "ultimate[ly] responsibl[e]" for corporate

24   decisions.  *Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179 (Del. 1986) ("The

25

_____

26   [3] The Complaint's lack of detail is at least in part a result of Plaintiffs' failure to make a Section 220 demand.  This is not to say that, were Plaintiffs to "gather information before filing [their derivative]

27   complaint[]," they would be able to meet the "heightened pleading standards." *CHC Invs., LLC* v. *FirstSun Cap. Bancorp*, 2019 WL 328414, at *5 (Del. Ch. Jan. 24, 2019).  It is merely to note that they

28   did not even try to use the tool available to them under Delaware law.

1    ultimate responsibility for managing the business and affairs of a corporation falls on its board of

2    directors.").  If accepted by the Court, Plaintiffs' contention would render Delaware's high pleading

3    standard meaningless—it could be satisfied in every case.  Plaintiffs take a similar tack by insisting that

4    the requisite director intent can be inferred because the "Company's compliance with the Consent

5    Orders was the most important issue facing the Company"—an apparent attempt to repurpose the "core

6    operations" theory sometimes applied in securities fraud actions.  (Opp'n 13.)  But "the 'core

7    operations' theory of scienter is inapplicable to the demand futility analysis."  *Henry* v. *Tyler*, 2020 WL

8    3574637, at *6 (N.D. Cal. July 1, 2020).  Indeed, Plaintiffs' principal case considered the importance of

9    the product at issue to the company as only *one* of five factors in assessing whether there are sufficiently

10    particularized allegations to infer conscious inaction.  *See Rosenbloom* v. *Pyott*, 765 F.3d 1137, 1154

11    (9th Cir. 2014).  It did not suggest that it was alone sufficient.  As the court observed in *Henry*, "the

12    importance of the relevant information [in *Rosenbloom*] to the corporation's business was accompanied

13    by numerous more specific and direct allegations supporting the Board's knowledge"—which are

14    wholly lacking here for Wells Fargo's current directors.  2020 WL 3574637, at *6.[4]

15        Plaintiffs nevertheless insist that deliberate inaction should be inferred from the HFSC reports'

16    discussion of what the Board generally knew about Wells Fargo's progress in fulfilling the Consent

17    Orders' requirements.  Plaintiffs vaguely assert that a majority of the Board was aware that the

18    regulators had expressed dissatisfaction with the Company's progress under the Consent Orders.  (Opp'n

19    10.)  They then ask the Court to "infer[]" from those allegations that the directors deliberately took "*no*

20    *action* to ensure [that] the Company remedied systemic weaknesses in controls identified by the

21

22    ---
    [4] Plaintiffs' insistence that Defendants "cannot have it both ways"—that the Board must have either
23    "reviewed the Company's communications with regulators" and "learned of the deficiencies and
    ongoing compliance failures" or consciously disregarded their duties by not learning such information
24    (Opp'n 13 n.9)—fares no better.  Courts have repeatedly rejected the argument that conscious inaction
    by a director can be inferred merely from the fact that an adverse corporate development occurred on the
    director's watch.  *See, e.g.*, *Baker*, 62 A.3d at 14.  Plaintiffs have not pled particularized allegations to
25    support their contention *either* that a majority of the directors was aware of the Company's
    unsatisfactory progress in satisfying the Consent Orders' requirements but exercised *no* oversight or that
26    a majority of the directors had no knowledge of the feedback received from the regulators and therefore
    must have consciously disregarded their duties.  Plaintiffs also ignore entirely a third, and far more
27    compelling inference:  that the directors "made efforts" to satisfy the Consent Orders' requirements but
    that management came up short.  *See Corbat*, 2017 WL 6452240, at *24.  That the Board's "efforts
28    failed in many instances . . . is not enough to support a plausible inference of bad faith."  *Id*.

1    Regulators." (*Id.* at 9-10 (emphasis added).) But that inference is not supported by particularized

2    factual allegations. The Complaint contains no particularized allegations regarding when or how the

3    Board consciously failed to act, and Plaintiffs never even explain what specifically individual directors

4    purportedly knew and decided not to do. Plaintiffs avoid even acknowledging that, since the Consent

5    Orders were issued in 2018, under the Board's direction, Wells Fargo has replaced its CEO (Compl.

6    ¶¶ 132, 240), several other senior executives (*id.* ¶¶ 51-52), and most of its directors (*id.* ¶¶ 38-50).

7        Plaintiffs similarly claim that their generic allegation that the Board was "focused on earnings

8    impact and lifting the asset cap" and "prioritizing [those interests] over actual progress on remediation"

9    is sufficient to plead that a majority of the Board engaged in bad-faith conduct. (Opp'n 1, 10.) In

10   support, however, Plaintiffs again cite only the section of the HFSC report that describes conduct by

11   Wells Fargo's *former* directors and *former* officer. (*Id.* at 10 (citing pages 47-55 of majority report).)

12   Moreover, general allegations of "motive and opportunity to enhance a company's business prospects,"

13   which are held by "virtually every company in the United States," are insufficient to plead bad faith.

14   *Lipton* v. *Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002). If a shareholder could plead bad

15   faith merely by alleging generally that a board focused on earnings, demand futility easily could be

16   alleged in every case. Plaintiffs' allegations also make no sense. The asset cap will not be lifted until

17   Wells Fargo satisfies the requirements of the FRB Consent Order. (Compl. ¶ 91.) Thus, if lifting the

18   asset cap was really the Board's (supposedly improper) focus, then Wells Fargo's directors would not

19   have taken "no action" to comply with the FRB Consent Order, as Plaintiffs contend (Opp'n 10).

20       When the underbrush is cleared away, Plaintiffs' argument boils down to the following: because

21   Wells Fargo has not yet satisfied the Consent Orders' requirements, a majority of the Board must have

22   breached its duty of loyalty. But "Delaware courts," and the Ninth Circuit too, "routinely reject the

23   conclusory allegation that because illegal behavior occurred, internal controls must have been deficient,

24   and the board must have known so." *Towers* v. *Iger*, 912 F.3d 523, 530 (9th Cir. 2018); *see also Baker*,

25   62 A.3d at 14 ("A stockholder cannot displace the board's authority [over the corporation's claims]

26   simply by describing the calamity and alleging that it occurred on the directors' watch."). The

27   Complaint is devoid of particularized allegations that any of Wells Fargo's current directors "decided to

28   simply give up on efforts to comply with the law." *Corbat*, 2017 WL 6452240, at *25. And Plaintiffs'

-6-

1    conclusory allegations that the "directors failed to do all they should have" are insufficient to plead bad

2    faith. *Crimson*, 2014 WL 5449419, at *23.[5]

3    **C.    The Complaint's Allegations Fall Short of Pleading the Extraordinary Conduct at Issue in the Few Cases That Have Excuse Demand under Delaware Law.**

4    Plaintiffs try to analogize their generalized allegations to the few cases in which demand has

5    been excused under Delaware law because the complaint adequately alleged that a majority of directors

6    faced a substantial likelihood of personal liability on a *Caremark* claim.  Plaintiffs' comparisons,

7    however, do not withstand scrutiny.  In each of those cases, the plaintiffs made detailed allegations of

8    egregious misconduct by the directors.  Plaintiffs here, by contrast, do not come close to pleading

9    similar misconduct by a majority of Wells Fargo's current directors sufficient to demonstrate that they

10   face a substantial likelihood of personal liability.

11   Plaintiffs first attempt (Opp'n 11) to equate this case to *In re Massey Energy Co.*, 2011 WL

12   2176479 (Del. Ch. May 31, 2011).  The court in *Massey*, upon review of a full evidentiary record

13   submitted with a motion for a preliminary injunction, identified a "myriad of particularized facts"

14   showing that the directors at issue "knowingly caus[ed] [the company] to seek profit by violating the

15   law," including that the company "had pled guilty to criminal charges" and had "been caught trying to

16   hide violations of law and suppress material evidence."  *Id.* at *20.  The company's criminal safety

17   failures and management's vocal disdain for regulatory oversight were detailed in numerous articles, *id.*

18   at *5-7 & nn.10, 15 & 30, *19-20 nn.134-35 & 147, regulatory safety reports, *id.* at *7-8 nn.24 & 43,

19   and an in-depth government investigatory report, *id.* at *19 & n.138.  Plaintiffs submitted evidence,

20   including Board minutes and deposition testimony, confirming that the  directors were aware of both the

21   company's appalling safety record and management's flouting of regulatory concerns, yet failed to step

22   in and take corrective action.  *E.g.*, *id.* at *8 n.25, *20 & n.142.  Numerous courts, including one in this

23   District, have distinguished *Massey* on the ground that it involved evidence of pervasive misconduct and

---

[5] After Plaintiffs filed their Opposition, the OCC issued a consent order to Wells Fargo Bank stating that the bank has "taken steps to comply with the 2018 [OCC Consent] Order and is committed to addressing the remaining requirements," but nevertheless finding that the bank has not "fully and timely" completed that process.  (OCC Consent Order AA-ENF-2021-30, at 3.)  Nothing in that order can remedy Plaintiffs' failure to plead particularized facts suggesting bad faith by any current director.  The order does not name, let alone attribute any conduct, inaction or knowledge to, any individual, and it expressly acknowledges the bank's efforts to comply with the 2018 OCC Consent Order's requirements.

1    willful blindness by directors.[6]  Plaintiffs' conclusory allegations of director misconduct here do not

2    remotely resemble the wholesale failures by the board in *Massey*.

3         Plaintiffs next cite two decisions by the Seventh Circuit (Opp'n 11-12), apparently because those

4    cases also involved compliance with agreements with regulators.  But the similarities end there.  In

5    *Westmoreland County Employee Retirement System* v. *Parkinson*, 727 F.3d 719 (7th Cir. 2013), the

6    plaintiffs alleged that the board "took no action to ensure the company's timely compliance with"

7    requirements under a consent decree to remediate issues with a defective product and effectively "threw

8    in the towel," *id*. at 726.  The court emphasized that the board allegedly "made a conscious decision to

9    *halt* these [remedial] efforts" in favor of pursuing the development of a different product.  *Id.* at 728.

10   The complaint supported these allegations with "particularized facts (*e.g.*, meeting dates and minutes)

11   indicating that the directors were intimately involved in overseeing the remedial effort."  *Id*.  Such

12   particularized facts are wholly lacking here.  Likewise, in *In re Abbott Laboratories Derivative*

13   *Shareholders Litigation*, 325 F.3d 795 (7th Cir. 2003), the complaint alleged that the company's

14   directors consciously "deci[ded] to not act," notwithstanding an "extensive paper trail" of reports to the

15   board over six years and specific allegations that regulators directly contacted individual directors, *id*. at

16   809.  Again, such particularized factual allegations are missing here.

17        Nor do Plaintiffs find support in the other non-Delaware cases they cite.  (Opp'n 14-15.)  In *In re*

18   *Pfizer Inc. Shareholder Derivative Litigation*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010), the complaint

19   "detail[ed] at great length a large number of reports made to members of the board"—in many instances,

20   "disturbing reports" of illegal kickbacks and of the deliberate continuation of illegal pharmaceutical

21   marketing practices *after* the company had entered into corporate integrity agreements with its

22   regulators to eliminate those practices, *id*. at 460.  Not only did the plaintiffs specifically allege that

23

24   [6] *See, e.g.*, *Corbat*, 2017 WL 6452240, at *23 ("The facts in *Massey* were extreme."); *Reiter* v.
     *Fairbank*, 2016 WL 6081823, at *14 (Del. Ch. Oct. 18, 2016) ("Unlike in *Massey* . . . the pled facts
     would not warrant the inference[] that . . . management embraced a strategy to pursue profits by
25   employing illegal means, much less that its directors were knowingly complicit in such a strategy");
     *Melbourne Mun. Firefighters' Pension Tr. Fund* v. *Jacobs*, 2016 WL 4076369, at *12 (Del. Ch. Aug. 1,
26   2016) ("The red flags alleged in *Massey* were far more egregious and indisputable than those alleged
     here."); *Gulbrandsen* v. *Stumpf*, 2013 WL 1942158, at *5 (N.D. Cal. May 9, 2013) (allegations in
27   *Massey* that "company itself had already pled guilty to criminal charges for a mine fire that killed two
     people, was caught trying to hide violations of the law, and had multiple civil settlements for mine
28   safety violations" were "not analogous").

1  individual directors were aware of these illegal practices, but they further alleged that the board and

2  senior management actively "retaliated against employees who reported internally that Pfizer's

3  marketing practices were illegal." *Id.* at 456.  No such allegations of director complicity exist here.  In

4  *McCall* v. *Scott*, 239 F.3d 808 (6th Cir. 2001)—a case involving allegations of widespread criminal

5  healthcare fraud—the plaintiffs pled a litany of "particularized facts" specific to each director, including

6  attendance at specific meetings, receipt of specific board reports, knowledge of an ongoing criminal

7  investigation, and, crucially, the board's prolonged failure to take *any* action to address the rampant

8  fraudulent conduct at the company, *id.* at 819-24. The Complaint here contains no such particularized

9  allegations of deliberate inaction by each of the directors; it barely even mentions individual directors.

10  **D.    Plaintiffs Cannot Plead Demand Futility by Citing the Risk Committee's Charter.**

11  As a last-ditch effort to plead a substantial likelihood of personal liability for four of the 13

12  directors at issue—*i.e.*, less than a majority of the Board—Plaintiffs cite the Risk Committee's charter.

13  (Opp'n 16 (citing Compl. ¶ 65).)  These citations are no substitute for particularized factual allegations.

14  "As numerous Delaware decisions make clear, an allegation that the underlying cause of a corporate

15  trauma falls within the delegated authority of a board committee does not support an inference that the

16  directors on that committee knew of and consciously disregarded the problem for purposes of Rule

17  23.1."  *Baker*, 62 A.3d at 17 & n.6.  Plaintiffs must plead particularized facts as to each individual

18  director to support their allegation of a substantial likelihood of personal liability on a *Caremark* claim;

19  the "existence of the [Risk] Committee and the scope of its charter are not sufficient to establish the

20  necessary connection to the [directors]." *Id.*[7]

21

22  [7] Each of the cases cited by Plaintiffs (Opp'n 16) involved particularized allegations of red flags and director knowledge.  *See In re SCANA Corp. Derivative Litig.*, 2018 WL 3141813, at *5 (D.S.C. June

23  27, 2018) ("Bechtel Report purportedly put 'every Board member on notice of insurmountable problems'" and "a memorandum disseminated by [a partner] . . . purportedly showed a concern about

24  whether releasing the Bechtel Reports to shareholders would expose directors and officers to liability"); *In re Intuitive Surgical S'holder Derivative Litig.*, 146 F. Supp. 3d 1106, 1121 (N.D. Cal. 2015)

25  ("Plaintiff has pleaded sufficient particularized facts to show that *beyond the directors' membership* in the Audit Committee, they knew of the defect and regulatory deficiencies." (emphasis added)); *Rosky* v.

26  *Farha*, 2009 WL 3853592, at *3-8 (M.D. Fla. Mar. 30, 2009) (detailing investigations "being conducted by no less than four state governments and three agencies of the federal government" and evidence of

27  insider trading by committee members themselves); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 277-78 (S.D.N.Y. 2008) (detailing "red flags signaling [the company's] inadequate

28  system of internal controls," including admissions in SEC filings of an internal control "deficiency," whistleblower complaints, and an audit report finding "at least nine . . .violat[ions] [of] federal export

-9-

**II.    Plaintiffs Fail To Plead a Single False or Misleading Statement, Much Less That Any Individual Director Deliberately Made Such a Statement or Allowed One To Be Made.**

The Opposition also fails to salvage Plaintiffs' contention that a majority of Wells Fargo's directors made or allowed to be made false or misleading statements about Wells Fargo's compliance with the Consent Orders. *First*, the Opposition does not describe a *single* allegedly false or misleading statement and explain why that statement is actionable. Despite their assertion that Defendants "made numerous statements to stockholders that misrepresented the status of the Company's compliance with the Consent Orders" (Opp'n 6), Plaintiffs never quote even one such statement—other than the Proxy Statement, which is not the basis of their false-statement claim. As Delaware courts have recognized, specifically identifying "which disclosures were misleading" and "what specifically the Company was obligated to disclose" are "critical . . . to establish a threat of director liability" for deliberately misinforming shareholders. *Citigroup*, 964 A.2d at 133. Plaintiffs' failure is all the more notable given that Defendants specifically pointed out (Mot. 13) that Plaintiffs had failed to explain why the challenged statements were purportedly false. This silence speaks volumes.

*Second*, "[i]t is entirely unclear from [Plaintiffs'] scattered allegations what precisely [they] believe was material information that the Board should have disclosed during this period." *In re Zimmer Biomet Holdings, Inc. Derivative Litig.*, 2021 WL 3779155, at *14 (Del. Ch. Aug. 25, 2021). Plaintiffs assert that "the Regulators had repeatedly rejected the Company's remediation plans as inadequate," "rebuked the board," and "threatened further enforcement action" (Opp'n 17-18), but they ignore that federal banking regulations *prohibited* the directors—on pain of civil and criminal penalties—from disclosing this confidential supervisory information. *E.g.*, 12 C.F.R. § 261.2(b)(1) (prohibiting unauthorized disclosure of "information that is or was created or obtained in furtherance of the [FRB]'s supervisory, investigatory, or enforcement activities . . . relating to any supervised financial institution, and any information derived from or related to such information"). Plaintiffs also do not describe how their amorphous allegations of regulatory feedback satisfy their burden to plead particularized factual allegations of "which disclosures were misleading, . . . what specifically the Company was obligated to

---

control laws"); *see also Ryan*, 918 A.2d at 356 n.38 (mentioning in a footnote that audit committee members who knowingly approved false financial statements "might be exposed to potential criminal liability for securities fraud").

-10-

1 disclose, and how the Company failed to do so." *Citigroup*, 964 A.2d at 133.  Indeed, federal banking
2 regulations establish that there was no ability, much less duty, to disclose regulatory feedback.

3     *Third*, Plaintiffs fail to identify any particularized factual allegations showing that any of the
4 directors approved statements that they knew were false.  Plaintiffs "must plead with particularly that
5 directors 'had knowledge that any disclosures or omissions were false or misleading or . . . acted in bad
6 faith in not adequately informing themselves,'" and "also must allege 'sufficient board involvement in
7 the preparation of the disclosures' to 'connect the board to the challenged statements.'"  *Zimmer*, 2021
8 WL 3779155, at *12.  Such allegations are totally absent here.  A plaintiff cannot satisfy its pleading
9 burden with allegations "that the documents were signed by the Director Defendants, or that they
10 'approved' the disclosures and 'caused' or 'consented to' their filing."[8]  *Id.* at *15.  That is the extent of
11 Plaintiffs' allegations here.  (Compl. ¶ 294; Opp'n 17.)

12     *Finally*, Plaintiffs cannot plead that two directors who were members of the Audit Committee
13 (Theodore Craver and Ronald Sargent) acted with the requisite knowledge and intent simply by pointing
14 to that committee's charter.  (Opp'n 18-19.)  Plaintiffs instead must plead particularized factual
15 allegations specific to each individual director.  *See Baker*, 62 A.3d at 17 & n.6.  For the reasons
16 explained above, Plaintiffs cannot plead that any individual director (including those on the Audit
17 Committee) acted with the required scienter in approving supposedly false or misleading disclosures
18 simply by citing a committee's charter.  *Citigroup*, 964 A.2d at 134 (dismissing complaint that "d[id]
19 not sufficiently allege," with "particular facts," that "the director defendants had knowledge that any
20 disclosures or omissions were false or misleading or that the director defendants acted in bad faith in not
21 adequately informing themselves").[9]

22

23 [8] The cases cited by Plaintiffs are not to the contrary.  In *In re infoUSA, Inc. Shareholders Litigation*,
24 953 A.2d 963, 991 (Del. Ch. 2007), the directors received a report that directly contradicted the
Form 10-K but nevertheless signed the document.  And *Cho* v. *UCBH Holdings*, 2011 WL 3809903, at
25 *2-3 (N.D. Cal. May 17, 2011), is not a derivative case, and thus has no bearing on the pleading
standard for demand futility.

26 [9] Again, the cases cited by Plaintiff are inapposite.  *Ryan* involved allegations that directors knowingly
approved falsely backdated stock options, not that the directors signed or issued public statements
27 allegedly containing false or misleading statements.  918 A.2d at 346-47.  As noted above (n.7), the
court mentioned the "audit committee" only in passing for the point that its members could face criminal
28 liability for approving false financial statements containing the backdated-options information.  *Id.* at
356 n.38.  *Hughes* v. *Xioaming Hu*, 2020 WL 1987029 (Del. Ch. Apr. 27, 2020), involved a *Caremark*

### III. Plaintiffs Fail Meaningfully To Address Defendants' Arguments That the Directors Do Not Face a Substantial Likelihood of Personal Liability on Plaintiffs' Section 14(a) Claim.

Plaintiffs' Section 14(a) claim suffers from a fundamental and fatal timing defect: Plaintiffs contend that the March 2018 Proxy misrepresented Wells Fargo's compliance with the Consent Orders (Opp'n 21), but that is chronologically impossible. In March 2018, the OCC and CFPB Consent Orders did not even exist, and Wells Fargo had not yet submitted its remediation plan to the FRB, much less received any feedback from the FRB on that plan. Wells Fargo thus could not have been out of compliance with any of the three Consent Orders, and the challenged statements in the 2018 Proxy could not have been false or misleading. (Mot. 17.) Although they do not dispute this timeline (Opp'n 22), Plaintiffs fail to explain why it does not doom their attempt to plead a Section 14(a) claim against the directors. *See Zoumboulakis* v. *McGinn*, 2014 WL 3926565, at *12 (N.D. Cal. Aug. 7, 2014) (complaint failed to allege that challenged statements in proxy were "false or misleading at the time made").

Nor do Plaintiffs address Defendants' argument that the challenged statements were actually "aspirational" statements that are non-actionable under established Ninth Circuit law. (Mot. 23.) As with the relevant timeline, the Opposition bears out the truth of Defendants' position. Plaintiffs argue that the 2018 Proxy "highlighted" the Board's "supposed *commitment*" to compliance with the Consent Orders and remedying known issues and also stated that "the Board was *focused* on 'all key enterprise risks facing [Wells Fargo's] business as well as oversight of the Corporate Risk Function.'" (Opp'n 21 (emphases added).) Plaintiffs' after-the-fact allegations of noncompliance with the Consent Orders do not render those statements false or misleading when made. The 2018 Proxy nowhere represented that Wells Fargo had successfully satisfied the Consent Orders' requirements or guaranteed that Wells Fargo would do so in the immediate future, but rather discussed only the Board's "commitment" and "focus." *See In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 835-36 (N.D. Cal. 2019) (statement that "[w]e've worked hard to make sure that we comply with the [consent order]" is "puffery" and "too vague to be actionable").

---

claim that the audit committee failed to reform the company's financial reporting system despite its knowledge that the company for years had been issuing faulty financial statements. Contrary to Plaintiffs' assertion, the court did not find the committee's approval of a particular financial statement to be a "'decision' made by the audit committee that could subject it to liability." (Opp'n 19.)

1   In short, Plaintiffs' Section 14(a) claim represents an improper effort to "bootstrap a breach of

2   fiduciary duty claim into a federal securities claim." (Mot. 16.) Plaintiffs essentially argue that they

3   have adequately alleged the oversight failures underlying their breach of fiduciary duty claims and that

4   those breaches should have been disclosed. (Opp'n 22.) The court in *In re Diamond Foods, Inc.*, 2012

5   WL 1945814 (N.D. Cal. May 29, 2012), *aff'd*, 575 F. App'x 716 (9th Cir. 2014), rejected a similar

6   argument. In that case, the plaintiffs alleged that the proxy falsely "stated that the 'company's annual

7   report filed on the 2010 Form 10K was in compliance with GAAP and that the company maintained

8   effective control over financial reporting.'" *Id*. at *7. But the complaint's allegations only concerned

9   "mismanagement," and the court held that "there can be no liability for a Section 14(a) claim based on a

10  theory of mismanagement." *Id.*

11      Plaintiffs relegate to a footnote their response to the exculpatory provision in Wells Fargo's

12  charter. (Opp'n 21 n.5.) That provision bars Plaintiffs' Section 14(a) claim for "negligently issu[ing]" a

13  proxy statement (Compl. ¶ 286) that allegedly failed to disclose directors' purported breaches of their

14  fiduciary duties. Plaintiffs make no effort to distinguish the multiple cases cited by Defendants

15  (Mot. 16) applying such exculpatory provisions under Delaware law to Section 14(a) claims.[10] And the

16  cases Plaintiffs do cite are readily distinguishable because none involved exculpation provisions under

17  Section 102(b)(7) of the Delaware General Corporation Law.[11] Indeed, Plaintiffs fail to cite a *single*

18  case that refused to apply exculpation under Section 102(b)(7) to a negligence-based Section 14(a) claim

19  asserted derivatively on behalf of the corporation. This Court should follow the multiple on-point

20  precedents cited by Defendants.

21

22

---

[10] *See also Pickett* v. *Gorevic*, 2021 U.S. Dist. LEXIS 63135, at *69 (S.D.N.Y. Mar. 26, 2021) ("Because this is an exculpated claim, these directors do not face personal liability under § 14(a); consequently, demand is not excused."); *City of Detroit Police & Fire Ret. Sys.* v. *Hamrock*, 2021 WL 877720, at *5 (D. Del. Mar. 9, 2021) ("Delaware law is clear that this type of exculpatory provision extends to all breaches of fiduciary [duty] except those arising from the duty of loyalty or for bad faith or intentional breaches. Plaintiff's 14(a) claim is grounded solely in negligence . . . [and therefore] demand is not excused." (citations omitted)).

[11] *See Cohen* v. *Viray*, 622 F.3d 188, 195 (2d Cir. 2010) (settlement indemnification clause conflicted with SEC's sole enforcement authority under 15 U.S.C. § 7243); *Baker, Watts & Co.* v. *Miles & Stockbridge*, 876 F.2d 1101, 1108 (4th Cir. 1989) (state action for indemnification preempted because wrongdoing had already "been plainly adjudicated, and a state action for indemnification would frustrate the basic enforcement of federal securities law"); *Credit Suisse First Boston, LLC* v. *Intershop*

-13-

1    Finally, Plaintiffs fail to plead the "essential link" required under Delaware law between the

2    2018 Proxy and the alleged damages.  Plaintiffs assert that "[h]ad the true facts been fully and fairly

3    disclosed, stockholders would not have voted to re-elect the incumbent directors" and instead would

4    have voted to require Wells Fargo to disclose more information about its incentive compensation

5    program.  (Opp'n 23.)  On the latter point, "[c]ourts in this district, and in other circuits, have held that a

6    Section 14(a) claim requires that the votes solicited by a false proxy statement *directly authorize* the

7    loss-generating corporate action."  *In re PayPal Holdings, Inc. S'holder Derivative Litig.*, 2018 WL

8    466527, at *4 (N.D. Cal. Jan. 18, 2018) (emphasis added).  Plaintiffs fail to explain how the rejection of

9    a proposal to require Wells Fargo to describe certain incentive compensation authorized "loss-generating

10    corporate action."[12]  On the former point—that stockholders would have elected different directors

11    absent the allegedly false or misleading statements—"[a] complaint alleging generally that the mere

12    election of directors was an essential link to the directors' subsequent wrongdoing does not satisfy

13    Section 14(a)'s requirements."  *In re PayPal*, 2018 WL 466527, at *4 (collecting cases).[13]

14    **IV.    Plaintiffs Fail To Plead That Wells Fargo CEO Charles Scharf Lacks Independence.**

15    Plaintiffs contend that only a single Wells Fargo director lacks independence—Charles Scharf.

16    Without citing a single paragraph of the Complaint, Plaintiffs argue that Scharf lacks independence

17    because of his role as CEO.  (Opp'n 19-20.)  As Defendants explained (Mot. 19), however, Scharf's

18    position alone is insufficient to plead a lack of independence under Delaware law.  *See Smith* v. *Carrillo*,

19    2019 WL 6328033, at *5 (D. Del. Nov. 26, 2019) ("[S]imple allegations that a director is also employed

20    by the company, without more, are insufficient to show that director lacks independence.");  *In re*

---

21

22    *Commc'ns AG*, 407 F. Supp. 2d 541, 548-49, 551 (S.D.N.Y. 2006) (rejecting public policy argument against director indemnity in indemnification action brought by corporation).

23    [12] Plaintiffs rely primarily on out-of-circuit case law when they claim that the proxy statement need not "directly authorize[] the loss generating corporate action."  (Opp'n 23 n.15.)

24    [13] Plaintiffs' cases are not to the contrary.  *See Emps. Ret. Sys. of City of St. Louis* v. *Jones*, 2021 WL
25    1890490, at *16-17 (S.D. Ohio May 11, 2021) (noting that plaintiffs "allege[d] far more than mere mismanagement or an isolated bad act," instead "set[ting] forth in detail that the Director Defendants
26    perpetrated an illicit bribery scheme" and that the directors' reelection as a result of proxy statement "enabled Defendants to continue their illicit bribery scheme.");  *In re Wells Fargo & Co. S'holder
27    Derivative Litig.*, 282 F. Supp. 3d 1074, 1102-03 (N.D. Cal. 2017) (agreeing that plaintiffs' "Section 14(a) claim is based not only on mismanagement and breach of fiduciary duty but also on fraud");  *In re Fossil, Inc*, 713 F. Supp. 2d 644, 649 (N.D. Tex. 2010) (alleging that directors and officers
28    concealed scheme by which they backdated stock options to themselves).

-14-

1    *Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1196 (N.D. Cal. 2007) (holding that "demand

2    futility cannot be pled merely on the basis of allegations that directors were paid for their service, and

3    acted or would act to preserve their positions").

4        Plaintiffs also point to Wells Fargo's 2020 Proxy Statement, which simply stated that Scharf is

5    not "independent" under New York Stock Exchange rules.  (Opp'n 20 n.13.)  Contrary to Plaintiffs'

6    assertion, that proxy statement said nothing about Scharf's being "incapable of exercising independent

7    business judgment with respect to a demand."   (*Id.*)   The mere classification of a director as not

8    independent under stock exchange rules is not, without more, sufficient to plead lack of independence

9    for demand-futility purposes.  *See Sandys* v. *Pincus*, 152 A.3d 124, 131 (Del. 2016) ("We agree with the

10   Court of Chancery that the Delaware independence standard is context specific and does not perfectly

11   marry with the standards of the stock exchange in all cases").  The 2020 Proxy Statement alone thus

12   cannot support Plaintiffs' claim that Scharf is not independent, and Plaintiffs offer nothing more.  And,

13   of course, had Plaintiffs adequately alleged Scharf's non-independence, that would get them only one-

14   seventh of the way to meeting their pleading burden with respect to majority of the Board.

15                                    **CONCLUSION**

16       Because Plaintiffs fail to plead that demand on the Board is excused as futile, the Complaint

17   should be dismissed for lack of standing under Rule 23.1(b)(3).  This dismissal should be with prejudice.

18   Plaintiffs already have been afforded an opportunity to amend their Complaint when the pending

19   derivative actions were consolidated.   The Opposition does not identify any additional facts that

20   Plaintiffs propose to include in a second amended complaint that would buttress their deficient

21   allegations of demand futility.  (*See* Opp'n 24-25.)  The Court therefore should reject their request to

22   amend their Complaint a second time.[14]

23

24

---

25   [14] Contrary to the Opposition's suggestion (Opp'n 25 n.17), when Plaintiffs sought Defendants' consent
     to amend their Complaint again, Defendants inquired as to what new allegations Plaintiffs intended to
26   include.  The only change that Plaintiffs identified was their intent to drop their claims based on the PPP
     and commercial lending, which they can and have done in their Opposition.  If Plaintiffs had additional
27   allegations that support their claim of demand futility, they had the opportunity to present them to the
     Court in the Opposition and seek leave to amend.  Tellingly, Plaintiffs chose not to do so.  The time for
28   amendments therefore has passed.

1    DATED:  September 22, 2021            Respectfully submitted,

2                                          _/s/ Brendan P. Cullen_____
                                           Brendan P. Cullen (SBN 194057)
3                                          (cullenb@sullcrom.com)
                                           SULLIVAN & CROMWELL LLP
4                                          1870 Embarcadero Road
                                           Palo Alto, CA 94303
5                                          Telephone: (650) 461-5600
                                           Facsimile: (650) 461-5700
6
                                           Christopher M. Viapiano (*pro hac vice*)
7                                          (viapianoc@sullcrom.com)
                                           SULLIVAN & CROMWELL LLP
8                                          1700 New York Avenue N.W., Suite 700
                                           Washington, D.C. 20006
9                                          Telephone: (202) 956-7500
                                           Facsimile: (202) 293-6330
10
                                           Richard C. Pepperman II (*pro hac vice*)
11                                         (peppermanr@sullcrom.com)
                                           Leonid Traps (*pro hac vice*)
12                                         (trapsl@sullcrom.com)
                                           SULLIVAN & CROMWELL LLP
13                                         125 Broad Street
                                           New York, NY 10004
14                                         Telephone: (212) 558-4000
                                           Facsimile: (212) 558-3588
15
                                           *Counsel for Nominal Defendant*
16                                         *Wells Fargo & Company*

17

18

19

20

21

22

23

24

25

26

27

28

1

**ATTESTATION**

2
I, Brendan P. Cullen, in compliance with Civil L.R. 5-1(i)(3), hereby attest that I obtained the

3
concurrence of all of the above-listed counsel in filing this document.

4
DATED:  September 22, 2021                        */s/ Brendan P. Cullen*

5
                                                                    Brendan P. Cullen

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28